Lewis H. GOLDFARB and Ruth S. Goldfarb, Plaintiffs,

v.

VIRGINIA STATE BAR and Fairfax County Bar Association, Defendants.

Civ. A. No. 75–72–A.

United States District Court, E. D. Virginia, Alexandria Division.

Jan. 5, 1973.

Alan B. Morrison, Washington, D. C., for plaintiffs.

Stuart H. Dunn, Asst. Atty. Gen., Richmond, Va., for defendant Virginia State Bar.

T. S. Ellis, III, John H. Shenefield, Lewis T. Booker, Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., for defendant Fairfax Bar Ass'n.

## MEMORANDUM OPINION

ALBERT V. BRYAN, Jr., District Judge.

This is a class action brought under the Sherman Act, 15 U.S.C. § 1, for injunctive relief and damages as allowed by 15 U.S.C. §§ 15, 26. The agreement allegedly restraining trade or commerce is a minimum fee schedule adopted by the defendant Fairfax Bar Association, consistent violations of which may subject an attorney to disciplinary measures initiated by committees of the defendant Virginia State Bar.[1]

The matter came on for hearing, on the issue of liability only, on December 13, 1972.

The Court adopts as part of its findings of fact the Stipulation of Facts entered into by the parties and filed on December 11, 1972,[2] the Proposed Findings of Fact submitted by the plaintiff numbered 1, 2, 3, 4, 5, 6, 7 and 8, the Proposed Findings of Fact submitted by the defendant Virginia State Bar numbered 1 and 2, and Proposed Findings of Fact submitted by the defendant Fairfax Bar Association numbered 6, 9, 10, 11, 12, 13, 18, 20, 21, 24, 25, 28, 29,

---

1. The Fairfax Bar Association and the Virginia State Bar are the remaining defendants in the case. Two other defendants, the Alexandria Bar Association and the Arlington County Bar Association have agreed to a consent judgment, by virtue of which they are directed to cancel their existing minimum fee schedules and enjoined from adopting, publishing or distributing any future schedules of minimum or suggested fees.

2. Stipulation No. 16 is actually a conclusion of law rather than a fact, and the Court does not adopt it or feel it necessary to the decision in this case.

33, 34, 35, 36, 37, 38,[3] 49 and 54,[4] copies of which are attached hereto.

■ Minimum fee schedules are a form of price fixing and therefore inconsistent with antitrust statutes prohibiting anti-competitve activities.

Price fixing is *per se* an unreasonable restraint of trade. It is not for the courts to determine whether in particular settings price-fixing serves an honorable or worthy end. An agreement, shown either by adherence to a price schedule or by proof of consensual action fixing the uniform or minimum price, is itself illegal under the Sherman Act, no matter what end it was designed to serve. United States v. Real Estate Boards, 339 U.S. 485, 489, 70 S.Ct. 711, 714, 94 L.Ed. 1007 (1950).

The scope of the statutory language in the Sherman Act is so expansive that courts have been reluctant to find exceptions. The language explicitly states that *"every* contract, combination or conspiracy which restrains commerce among several states is unlawful." (Emphasis supplied.) Illustrative of this reluctance is the refusal to extend baseball's exempt status to other professional sports. See Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955). The fact that specific exemptions are clearly delineated suggests that ambiguities should be resolved in favor of inclusion. This is especially true where price-fixing is involved since it has been declared both pernicious and lacking in any redeeming social value. Northern Pacific Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1957); United States v. National

Ass'n. of Real Estate Boards, *supra*; see also United States v. Trenton Potteries Company, 273 U.S. 392, 397, 47 S.Ct. 377, 71 L.Ed. 700 (1927):

[T]he aim and result of every price-fixing agreement, if effective is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of to-morrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints.

. . .

■ The minimum fee schedule actually proposes a floor upon which professional fees should be set. This type of price-fixing has been held under other circumstances to be repugnant to the philosophy of the Sherman Act. Plymouth Dealers Ass'n. v. United States, 279 F.2d 128 (9th Cir. 1960). It is contrary to the spirit of competition which sustains a free enterprise system in that it prevents competitors from using their own judgment in determining the value of their own services. Kiefer-Stewart Co. v. Seagram and Sons, 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951). Although attorneys can violate the proposed fee schedule (at the risk, of course, of being subjected to a charge of unethical conduct) a defendant's liability under the Sherman Act depends not on actual adherence to the schedule but rather on the mere existence of an

3. Although the title insurance companies have a right to look to the individual attorney who examined the title for indemnification, the evidence is that there is no known case where such indemnification was ever actually sought. Of course, the specific fee complained of here by the plaintiffs, which is the title examination fee of 1% of the first $50,000 of pur-

chase price plus ½% of all over $50,000, is *in addition* to the title insurance premium.

4. Since the hearing on December 13 was devoted solely to the issue of liability, it was understood in advance that no testimony with regard to the amount of any damages would be presented.

agreement which restricts competition by price-fixing. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Plymouth Dealers Ass'n. v. United States, *supra*.

There is no distinction between the benefits ascribed to the minimum fee schedule by its advocates and those existing in a minimum sales price if, for example, the latter were to be adopted by General Motors and Ford Motor Company as to suggested sales prices for comparable automobiles. In each instance, a new dealer and a new lawyer, both unfamiliar with the customary charges in the field, would find such a minimum fee or sales price schedule helpful in setting charges. In each instance an adequate fee or price would insure a margin of profit adequate to assure further research and development or continued legal education. In each instance the public would be assured, by an examination of such schedule, that what was being charged was in line with what was generally charged in the field. Yet in none of these instances would a member of the public have any better idea that the fee or price was reasonable after he had seen the schedule than he did before. The minimum fee schedule for real estate settlements, based as it is on a percentage of the purchase price, is particularly hard. to justify as having any relation to the labor involved. This is particularly so in view of the fact that the "responsibility" involved is assured by a separate charge for title insurance. The attorney's ultimate "responsibility" is illusory. *See* Footnote 3, *supra*. Such an across-the-board rate, coupled with the testimony of both Goldfarb as to his efforts to obtain legal services, and Attorney F. Shield McCandlish that a flat fee results in some overcharges which make up for undercharges, is sufficient for the Court to infer, which it does, that some damage resulted to the plaintiff.

 Having concluded that it is a price fixing agreement, there remain the questions whether the activity constitutes or substantially affects interstate commerce, whether professional legal services are a trade within the meaning of the Sherman Act, and whether the activities involved constitute lawfully regulated state action not subject to the provisions of the Sherman Act under Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). All of these questions are raised as defenses by both remaining defendants. They will be considered in the order mentioned.

The facts found by the Court reveal (from what the Court considers a fair sampling of loans made on real estate in Fairfax County, Virginia, and the area generally serviced by the defendant Fairfax Bar Association, in which is located the subdivision of Reston whose residents make up the plaintiff class) that a significant portion of funds furnished for the purchasing of homes in Fairfax County comes from without the State of Virginia. All or nearly all of the lenders making such loans require, as a condition of making the loan, that the title to the property involved be examined and that title insurance be furnished and paid for by the home buyer-mortgagor. This alone warrants the conclusion that interstate commerce is sufficiently affected to sustain jurisdiction under the Sherman Act. There is also uncontradicted evidence that a large percentage of persons who live in Fairfax County work outside of Virginia and that significant amounts of loans on Fairfax County real estate are guaranteed by the United States Veterans Administration and Department of Housing and Urban Development, both headquartered in the District of Columbia. The fees charged for the title examination and insurance just mentioned are covered by the minimum fee schedule here in question. Accordingly, the Court concludes that the requirement of "commerce among the several states" of 15 U.S.C. § 1 is met.

Whether lawyers are exempt from the Sherman Act because they perform personal services as a learned profession has never been squarely met by the Supreme Court. Although the Supreme Court declined to intimate the correctness of applying the term "trade"

to professions, it has declared the services of real estate brokers to be a commercial activity carried on for profit regardless of the fact that each is in business on his own. United States v. National Ass'n. of Real Estate Boards, *supra*, 339 U.S., at 490, 492, 70 S.Ct. 711.

> The fact that the business involves the sale of personal services rather than commodities does not take it out of the category of "trade" within the meaning of § 3 of the [Clayton] Act. Id. at 490, 70 S.Ct. at 715.

Hence, despite dicta by that court, this Court is unwilling to rest its decision on such an exemption. The Court has some question whether the adoption of a minimum fee schedule is itself "professional." It seems to the Court that there is a basic inconsistency between the lofty position that professional services, not commodities, are here involved and the position that a minimum fee schedule is proper. The former properly contemplates differences in abilities, worth and energies expended of those rendering the services. Such differences are made as meaningless by a minimum fee schedule as they would be by a maximum fee schedule. Although there is as yet no evidence of this here, the minimum fee schedule does permit the charging, by an attorney, of more than the services are worth. Certainly fee setting is the least "learned" part of the profession.

The third question is the most difficult in the Court's view. In this regard it is important to point out just what is done by the various entities involved.

Va.Code Ann. § 54–59 (1972 Repl.Vol.) authorizes the Supreme Court of Virginia to "prescribe, adopt, promulgate and amend rules and regulations organizing and governing the association known as the Virginia State Bar, composed of the attorneys at law of this State, to act as an administrative agency of the Court for the purpose of investigating and reporting the violation of such rules and regulations as are adopted by the Court under this article to a court of competent jurisdiction for such proceedings as may be necessary, and requiring all persons practicing law in this State to be members thereof in good standing."

Pursuant to this authority the Supreme Court of Virginia has promulgated rules and regulations governing the conduct of attorneys and the operation of the Virginia State Bar as found in Sections II and IV, Part 6, Rules of the Supreme Court, 205 Va. 1011, as amended January 1, 1971, and 210 Va. 411 (1/19/70). As stipulated (Stipulations 10 and 11) the powers of the Virginia State Bar have been delegated to the Council of the Virginia State Bar, the Virginia State Bar is required by statute and rule to investigate alleged violations of the standards of conduct mandate by the Virginia Supreme Court, and the Virginia State Bar has been given authority to issue opinions on matters involving questions of ethics. It is stipulated that the Supreme Court of Virginia has stated that suggested fee schedules involved such questions of ethics (Stipulations 17 and 18). Pursuant to its acknowledged authority the State Bar has issued Opinions 98 and 170 (Plaintiff's Exhibits 30 and 31) which in effect say that it is unethical habitually to charge fees below those suggested in a minimum fee schedule. The Fairfax Bar Association has adopted a minimum fee schedule although it was under no compulsion to do so. The minimum fee schedule of the Fairfax Bar Association is a private undertaking and did not derive its authority or its efficacy from the legislative command of the State and would have become operative and effective without any command from the legislature or the Supreme Court. Parker v. Brown, *supra*. The fact that the State furnishes a vehicle for its enforcement upon complaint does not extend immunity to the local bar association. Indeed, the State cannot "give immunity to those who violate the Sherman Act by authorizing them to violate it or by declaring their action is lawful." Parker v. Brown, *supra,* 317 U.S., at 351, 63 S.Ct., at 314. The State here has not specifically retained the ultimate power to control private action, and the private persons who make up

the Fairfax Bar Association are allowed unbridled freedom to select their own course of conduct. Allstate Insurance Co. v. Lanier, 361 F.2d 870 (4th Cir. 1966), cert. denied 385 U.S. 930, 87 S.Ct. 290, 17 L.Ed.2d 212 (1966); Asheville Tobacco Board of Trade v. F.T.C., 263 F.2d 502 (4th Cir. 1959). Since the Fairfax Bar Association has selected its own course of conduct, the antitrust laws remain in full force and effect as to it. Its minimum fee schedule is declared to be illegal under 15 U.S.C. § 1, enjoinable under 15 U.S.C. § 26, and the case against it shall be set down for trial for the ascertainment of any damages provable under 15 U.S.C. § 15.

■ In its minor role in this matter, the Virginia State Bar was engaged in state action. There is no assertion that any actions taken by the Supreme Court of Virginia, the Virginia State Bar, or the Council of the Virginia State Bar were not within the scope of their statutory or rule—created authority.[4] The rationale behind the holding of Parker v. Brown, *supra*, that the Sherman Act restrains only actions of private persons and not state action, applies equally to both a state's judicial actions and its legislative actions. Whatever force or efficacy the Virginia State Bar had in rendering opinions and supplying the enforcement machinery for violations of ethical conduct it derived from the judicial and "legislative command of the State and was not intended to operate or become effective without that command."

The claim against the Virginia State Bar is even less persuasive when the specific relief sought is examined. Insofar as injunctive relief under 15 U.S.C. § 26 is concerned, that is only allowable when there is a threatened loss or damage by a violation of the antitrust laws. Here the uncontradicted evidence is that there has never been any action taken by the Virginia State Bar to discipline any attorney for consistently charging less than the fee suggested in a minimum fee schedule. Nor is any such action contemplated. Moreover the decision by the Court as to the illegality of the fee schedule insofar as the Fairfax County Bar Association is concerned removes the only ground upon which discipline could be sought.

■ Insofar as damages are concerned, it is stipulated that the Virginia State Bar is an administrative agency of the Supreme Court of Virginia. Aside from any Eleventh Amendment considerations, such an agency was surely never intended to be included among those liable for damages under 15 U.S.C. § 15.

Counsel for plaintiff should prepare an order incorporating this memorandum by reference; declaring illegal and directing cancellation of the minimum fee schedule of the Fairfax Bar Association; enjoining that association from adopting, publishing, or distributing any future schedules of minimum or suggested fees; dismissing the action as to the Virginia State Bar; and continuing the case until January 26th 1973, for a determination of the method to be used in ascertaining what, if any, damages have been sustained by members of the plaintiff-class. The order should be presented for entry after submission to other counsel for approval as to form.

PROPOSED FINDINGS OF FACT BY

THE PLAINTIFF ADOPTED BY
THE COURT

1. According to the United States Bureau of the Census (Exhibit 33, pp. 400, 402, and 408), of the 162,396 persons five years of age or older who resided in Arlington County, Virginia in 1970, 50,590 (31.15%) resided outside of

---

4. It is arguable that 15 U.S.C. § 1 is a "statute" within the meaning of Va.Code Ann. § 54–51 (1972 Repl.Vol.) which precludes the Supreme Court of Virginia from adopting a code of ethics inconsistent with any statute. If the Supreme Court of Virginia adopted a minimum fee schedule, if it does not have inherent power to do so without regard to § 54–48, if a minimum fee schedule has anything to do with ethics (which this Court questions), and if, indeed, an entity can violate a statute which has been declared inapplicable to it, this might have to be met. In any event, the argument is not asserted by any party.

Virginia in 1965; of the 414,521 persons five years of age or older who lived in Fairfax County, Virginia in 1970, 129,955 (31.35%) lived outside of Virginia in 1965; of the 101,178 persons five years of age or older who resided in the City of Alexandria in 1970, 30,972 (30.61%) lived outside of Virginia in 1965.

2. An examination of deeds of trust in one of every ten chronological deed books for the years 1970 and 1971 in the office of the Recorder of Deeds of Fairfax County yielded the following information concerning the amounts of mortgages and the location or place of incorporation of beneficiaries (mortgagees):

| | |
|---|---|
| Beneficiary located or incorporated outside Virginia | $ 75,615,096.21 |
| Beneficiary located or incorporated inside Virginia | 47,818,321.92 |
| Beneficiary location or place of incorporation undetermined | 12,847,702.84 |
| total: | $136,281,120.97 |

When all deeds of trust in the amount of $100,000 or more were subtracted from the above totals, the following Adjusted Totals were obtained:

| Out of State | In State | Location Undetermined | Totals (Adjusted) |
|---|---|---|---|
| $75,615,096.21 | $47,818,321.92 | $12,847,702.84 | $136,281,120.97 |
| (41,669,307.55) | (13,101,921.88) | (4,491,230.40) | (59,262,459.83) |
| $33,945,788.66 (Totals Adjusted) | $34,716,400.04 | $ 8,356,472.44 | $ 77,018,661.14 |

---

3. The United States Veterans Administration, which is headquartered in the District of Columbia, guarantees loans to certain veterans under the provisions of 38 U.S.C. § 1810 for, *inter alia*, the purchase or construction of homes. The Veterans Administration guaranteed the following numbers and amounts of home loans in Northern Virginia during the fiscal years indicated:

| Fiscal Year | | Fairfax County | Arlington County | City of Alexandria | Totals |
|---|---|---|---|---|---|
| 1968 | No. | 785 | 124 | 214 | 1,123 |
| | Amt. | $ 20,891,705 | $ 3,023,200 | $ 5,144,700 | $ 29,059,605 |
| 1969 | No. | 1,921 | 343 | 661 | 2,925 |
| | Amt. | $ 55,516,775 | $ 8,638,475 | $17,677,650 | $ 81,832,900 |
| 1970 | No. | 1,737 | 258 | 553 | 2,548 |
| | Amt. | $ 54,663,294 | $ 7,205,890 | $15,631,215 | $ 77,500,399 |
| 1971 | No. | 1,460 | 306 | 699 | 2,465 |
| | Amt. | $ 49,602,652 | $ 9,015,100 | $22,463,425 | $ 81,081,177 |
| 1972 | No. | 2,854 | 349 | 585 | 3,788 |
| | Amt. | $105,056,807 | $11,277,135 | $18,935,915 | $135,269,857 |

---

4. The United States Department of Housing and Urban Development, which is headquartered in the District of Columbia, insures certain home mortgages pursuant to 12 U.S.C. § 1706c et seq. The number and amount of such loans in Northern Virginia during designated fiscal years is as follows:

| Fiscal Year | | Fairfax County | Arlington County | City of Alexandria |
|---|---|---|---|---|
| 1968 | No. | 1,377 | 229 | 150 |
| | Amt. | $33,162,200 | $4,636,200 | $2,685,900 |
| 1969 | No. | 1,196 | 197 | 128 |
| | Amt. | $29,041,550 | $4,053,200 | $2,273,450 |
| 1970 | No. | 927 | 158 | 134 |
| | Amt. | $23,680,450 | $3,373,350 | $2,484,000 |
| 1971 | No. | 910 | 188 | 146 |
| | Amt. | $25,187,250 | $4,603,000 | $3,089,250 |
| 1972 | No. | 832 | 148 | 152 |
| | Amt. | $23,326,800 | $3,729,050 | $3,255,000 |

5. The Goldfarbs were charged a fee for the examination of the title to their home by A. Burke Hertz which was calculated in accordance with the effective Minimum Fee Schedule published by the Local Bar Associations (Exhibit 29).

6. Among attorneys who perform title examination services in connection with the purchases of homes in Northern Virginia, there is a significant degree of adherence to the Minimum Fee Schedule (Exhibit 29) in the determination of fees.

7. The Goldfarbs were not reasonably able to obtain legal services in examining the title to their home for a rate less than that set forth in the Minimum Fee Schedule of the Local Bar Associations (Exhibit 29).

8. A significant reason for the inability of the Goldfarbs to obtain legal services for the examination of the title to their home for less than the fee set forth in the Minimum Fee Schedule (Exhibit 29) was the operation of the minimum fee schedule system.

PROPOSED FINDINGS OF FACT BY THE DEFENDANT VIRGINIA STATE BAR ASSOCIATION ADOPTED BY THE COURT

1. No complaint has been received by the Virginia State Bar from any person or organization in any area of the Commonwealth with respect to the failure of a member of the Virginia State Bar to adhere to a minimum fee schedule.

2. There are no persons or agents employed by the Virginia State Bar to investigate matters of unethical conduct except and until receipt of an official complaint.

PROPOSED FINDINGS OF FACT BY THE DEFENDANT FAIRFAX BAR ASSOCIATION ADOPTED BY THE COURT

(6) The Canons of Ethics and the Code of Professional Responsibility promulgated by the Supreme Court of Virginia contemplate and approve suggested or advisory fee schedules. (See Canon 12 and Rules for Integration of the Virginia State Bar, Part 6 II EC 2–18, DR2–106.)

(9) Under the Canons of Ethics and the Code of Professional Responsibility, as promulgated by the Supreme Court of Virginia and the American Bar Association, it is unethical conduct for an attorney either to fix legal fees based solely on the recommended fees contained in an advisory minimum fee schedule without regard to other relevant factors, or, for the purpose of soliciting business, consistently to charge fees below the recommended fees. Neither the Virginia State Bar nor any of its district committees has ever received any complaint regarding either type of unethical conduct. Neither has the Virginia State Bar nor any of its district committees ever initiated or participated in any administrative or judicial action against an attorney for having engaged in either type of unethical conduct described above. (Trial Testimony) (See American Bar Association Formal Opinion 20, dated May 5, 1930; American Bar Association Formal Opinion 171, dated July 23, 1937; American Bar Association Formal Opinion 323, dated August 9, 1970.)

(10) The Virginia State Bar is authorized by the Supreme Court of Virginia to render advisory opinions on any question of contemplated professional conduct. Pursuant to this authority, the Virginia State Bar issued Opinions 98 and 170 which affirm the propriety of advisory or suggested fee schedules. (See Stipulation of Facts and Opinions 98 and 170.)

(11) In 1969 and on previous occasions, the Virginia State Bar has published Minimum Fee Schedule Reports setting forth and analyzing the existing fee schedules promulgated by various local bar associations in Virginia. (Trial Testimony)

(12) The following statement appeared on page 3 of the Minimum Fee

Schedule Report published in 1969 by the Virginia State Bar:

"The recommended minimum fee figures in the committee's report represent the consensus recommendation of members of the committee as to fees which should be assessed in 1969 for the legal services indicated."

Further, on page 11 of the Minimum Fee Schedule Report published by the Virginia State Bar in 1969, it is recommended that the fee for title examination be one percent of the first $50,000 of the loan amount or purchase price and one half of one percent of the loan amount or purchase price from $50,000 to $250,000. These provisions are essentially identical to the advisory information contained in the Minimum Fee Schedule promulgated by the Fairfax Bar Association.

(13) The Canons of Ethics and the Code of Professional Responsibility promulgated by the Supreme Court of Virginia state that, in determining charges for title examination and certification, it is proper to consider a minimum fee schedule or the fee customarily charged in the community for such services.

### Canon 12

"In fixing fees, lawyers should avoid charges which overestimate their advice and services, as well as those which undervalue them. A client's ability to pay cannot justify a charge in excess of the value of the service, though his poverty may require a less charge, or even none at all. The reasonable requests of brother lawyers, and of their widows and orphans without ample means, should receive special and kindly consideration.

"In determining the amount of the fee, it is proper to consider: (1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the cause; (2) whether the acceptance of employment in the particular case will preclude the lawyer's appearance for others in cases likely to arise out of the transaction, and in which there is a reasonable expectation that otherwise he would be employed, or will involve the loss of other employment whil employed in the particular case or antagonisms with other clients; (3) the customary charges of the Bar for similar services; (4) the amount involved in the controversy and the benefits resulting to the client from the services; (5) the contingency or the certainty of the compensation; and (6) the character of the employment, whether casual or for an established and constant client. No one of these considerations in itself is controlling. They are mere guides in ascertaining the real value of the service.

"In determining the customary charges of the Bar for similar services, it is proper for a lawyer to consider a schedule of minimum fees adopted by a Bar Association, but no lawyer should permit himself to be controlled thereby or to follow it as his sole guide in determining the amount of his fee.

"In fixing fees it should never be forgotten that the profession is a branch of the administration of justice and not a mere money-getting trade."

### Code of Professional Responsibility
### EC 2–18

"The determination of the reasonableness of a fee requires consideration of all relevant circumstances, including those stated in the Disciplinary Rules. The fees of a lawyer will vary according to many factors, including the time required, his experience, ability, and reputation, the nature of the employment, the responsibility involved, and the results obtained. Suggested fee schedules and economic reports of state and local bar associations provide some guidance on the subject of reasonable fees. It is a commendable and long-standing tradition of the bar that special consideration is given in the fixing of any fee

for services rendered a brother lawyer or a member of his immediate family."

## DR 2–106

(A) A lawyer shall not enter an agreement for, charge, or collect an illegal or clearly excessive fee.

(B) A fee is clearly excessive when, after a review of the facts a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

(18) Numerous attorneys who are members of the Fairfax Bar Association have charged fees for title examination different from those suggested in the Minimum Fee Schedule. (Trial Testimony)

(20) Defendant Fairfax Bar Association has never investigated, communicated with or imposed sanctions upon any member or any other licensed attorney for failing to adhere to any minimum fee schedule. Further, defendant Fairfax Bar Association has never induced or attempted to induce any other person or organization to investigate, communicate with or impose sanctions upon any member of Fairfax Bar Association or any other licensed attorney for failure to adhere to any minimum fee schedule. (Trial Testimony)

(21) Attorneys who have handled many of the real estate closings in Reston, Virginia have not rigidly adhered to the Minimum Fee Schedule promulgated by the Fairfax Bar Association. (Trial Testimony)

(24) Mr. and Mrs. Goldfarb were residing within the Commonwealth of Virginia at the time they contracted to purchase their home in Reston, Virginia. (Trial Testimony)

(25) Both the builder who constructed the home in Reston, Virginia purchased by Mr. and Mrs. Goldfarb and the real estate agent through whom they purchased are and were located in Reston, Virginia. (Trial Testimony)

(28) All of the acts performed by A. Burke Hertz in connection with the examination and certification of the title of the land in Reston, Virginia purchased by Mr. and Mrs. Goldfarb were performed within the Commonwealth of Virginia. (Trial Testimony)

(29) All transactions relating to the purchase by Mr. and Mrs. Goldfarb of their home in Reston, Virginia, including the negotiation for sale, contract of sale, title examination, securing of mortgage loan, settlement and all legal services, occurred within the Commonwealth of Virginia. (Trial Testimony)

(33) The purpose of a title examination and certification is to assure the purchaser of real estate that the land he is purchasing will not be subject to future claims as a result of past actions by prior owners. A title examination and certification assures the purchaser of real estate the free and unencumbered

use and enjoyment of his land. (Trial Testimony)

(34) The duties and responsibilities of an attorney in connection with a residential real estate transfer in Reston, Virginia include the following:

(a) Initial telephone conversations and correspondence concerning general procedures and costs.

(b) Reading contract and any correspondence associated with it.

(c) Opening file and cross indexing under seller, purchaser, lender and property.

(d) Checking on past surveyor for possible recertification.

(e) Ordering house location survey.

(f) Checking on possible reissue rates on existing title insurance policies.

(g) Examination of title (more fully described in Findings Nos. 35 and 37 *infra.*).

(h) Writing for pay-off figures and determining existing trust holders.

(i) Preparation of application for title insurance binder.

(j) Transmitting application to title insurance company.

(k) Forwarding title binder to lender.

(l) Miscellaneous telephone calls relating to fire insurance, title insurance, closing costs, payment of taxes, getting termite certification, closing procedures and order, etc.

(m) Coordination of settlement date and time with lender, agent, seller, purchaser, other attorneys.

(n) Quoting verbal closing costs to seller, purchaser, agent and lender.

(o) Preparation of settlement documents—deed, note, deed of trust, settlement statements, transmittal letters.

(p) Computing settlement statements.

(q) Fulfilling all conditions of sales contract.

(r) Completing truth in lending form and other forms required by lender.

(s) Preparation of disbursement statement.

(t) Attorney review title and file for settlement. (More fully described in Findings Nos. 35 and 37 *infra.*)

(u) Submitting documents to lender, purchaser, or another attorney for review prior to settlement.

(v) Conducting settlement(s).

(w) Sending all required papers to lender.

(x) Depositing funds.

(y) Preparation of documents for recording, including notarizing, blue-backing, initialing. (More fully described in Findings Nos. 35 and 37 *infra.*)

(z) Bring-down title. (More fully described in Findings Nos. 35 and 37 *infra.*)

(aa) Recording papers.

(bb) Writing disbursement checks.

(cc) Forwarding disbursement checks.

(dd) Preparation of Deeds of Release.

(ee) Preparation of notes for marginal release.

(ff) Releasing notes on margin of land records.

(gg) Sending Deeds of Release to Trustees.

(hh) Recording Releases.

(ii) Conforming file copies of settlement documents with recording information.

(jj) Preparation of final title insurance policy application.

(kk) Preparation of Certificates of Title.

(ll) Forwarding final title insurance applications, then policies, all recorded documents to proper parties.

(mm) Final review of file for closing.

(nn) Closing and filing of file.

(35) In the course of examining and certifying a title to real estate, an attorney in Virginia must perform at least the following steps:

(A) A search of the grantor and grantee indices for at least a sixty year period. Each index covers approximate-

ly a ten year period. Therefore, to perform a sixty year search, six to eight indices must be thoroughly examined. In Fairfax County, a search of the "land book" is also required in order to ascertain the assessed value to the landowner as of January 1.

(B) After a chain of owners is established from a search of the grantor and grantee indices for sixty years, a complete check must be made for each of these owners (known as "abstracting the title chain") on all deeds, deeds of trust, deeds of release, homestead deeds, mortgages, powers of attorney, leases, notices of *lis pendens,* mechanics' liens, chancery suits to enforce mechanics' liens, etc. All of these items might be recorded in several deed books or in a single deed book, depending upon the jurisdiction. In Fairfax County, there are separate deed books for the aforementioned items.

In making a complete check of all the owners in the chain of title, care must be taken to note for each owner the type of deed, its date, the date of recording, the consideration involved, the complete description of the land, the easements, rights of way, restrictive covenance and other impediments to the free and unencumbered use of the land and whether legal requirements for signature and notarization were met in all cases. Any suggestion of a possible interference with the free and unencumbered use of the land by the new purchaser must be noted on the abstract and evaluated by the attorney.

If the parcel of land in question derives from a larger tract of land, a plat of the original land with all its divisions must be drawn or obtained by the attorney. This task may involve converting a "metes and bounds" description usually written in terms of robs, chains, degrees, perches, acres or other measurements, into feet or to a subdivision reference of lot, block and section.

In the event that a former owner in the chain of title was one who transferred a great deal of property, each deed from that owner must be located and read to determine whether the specific property involved in the current sale was, in fact, included in an earlier deed. Where similar names occur or names have been changed, as when women marry, this might well involve reading a very large number of deeds.

(C) Often, estates and inheritances of the property appear in the chain of title. In this event, the Will Index and docket records must be checked to determine whether any flaws existed in property transfers of this sort.

(D) In all cases it is necessary to check the Judgment Lien Indices in order to discover whether any judgments are outstanding against the property. In Fairfax County, there are four sets of indices of judgments to be searched. The indexed judgments must then be checked against the judgment lien docket to determine whether the judgments indexed have been satisfied. For Reston, that must be done daily for numerous subsidiary corporations of Gulf Reston, Inc., all of which hold title to property in Reston.

(E) In Fairfax it is also necessary to check the index of financing statements on household fixtures in order to determine whether unsatisfied financing statements exist. In Fairfax County, this entails checking two sets of indices.

(F) In the event subdivision plans are involved, plat or map books must be consulted for subdivision plans not recorded in deed books. Plat books should also be checked for easements and building restrictions on the property.

(G) Oftentimes, corporate owners appear in the chain of title. In this event, questions of corporate law may arise. For example, if the sale of land included all or substantially all of the assets of the corporation which were not sold in the regular course of business, then stockholders' consent to the sale must be located and verified. In addition, in some cases, verification of the name of the officers who executed a corporate deed must be obtained from the State Corporation Commission and a check

should also be made to determine whether the corporate grantor is still in existence.

(H) In all cases, federal, state, county and town or city tax records must be checked to establish whether any unpaid taxes exist as a possible lien against the property. There are several sources for this information. First, a check must be made with the Treasurer or Commissioner of Revenue to obtain information on local real estate taxes. Attorneys must be particularly careful in this area as real estate taxes in Fairfax County are payable twice a year and reassessments are frequent.

In the event that a former owner in the chain of title is an estate, the executor of an estate should personally give an affidavit to the effect that all federal estate and gift taxes and Virginia inheritance taxes are paid or nonassessable.

(I) The possible bankruptcy of any former owner in the chain of title should be checked. This information may be found in the grantor index under the name of the bankrupt former owner. However, this information need not be recorded there and it is also necessary to check the Federal District Court records.

(J) In addition to all of the foregoing, it is sometimes necessary to check additional records such as alimony and child support decrees, special commissioner deeds, and judicial sale records.

Once all of the foregoing steps are completed, an attorney must review his findings and evaluate all possible defects noted in the chain of title. (Trial Testimony.)

(36) While a title examination in Reston generally involves the steps outlined in Finding No. 35, factors peculiar to the Reston property further complicate the procedure. These factors include:

(a) Complex financing and transfer arrangements involved in the original transaction creating Reston, including a conveyance with a leaseback and both an option and an obligation to repurchase.

(b) The existence of numerous corporate subsidiaries of Gulf Reston, Inc. set up, in part, for the purpose of holding title to various parcels in Reston.

(c) The very large number of real estate transactions occurring in Reston on a daily and weekly basis.

(Trial Testimony.)

(37) Because of the peculiar nature of Reston, the following specific steps are often followed on a daily basis in connection with the examination and certification of a title to property in Reston.

(a) The grantor and grantee indices must be checked daily and all entries added to the grantor and grantee conveyance list for Gulf Reston, Inc., John Hancock Mutual Life Insurance Company, Belwood, Inc., Bonres, Inc., Bonner Reston Associates, Pignolia, Inc., the Ryland Group, Inc. and Teeshot, Inc., and this must also be done for several other corporations at less frequent intervals. This same procedure must also be followed for all unindexed instruments.

(b) After obtaining deed book and page references, the recorded instrument is examined and either abstracted or conformed or copies made. If these are extremely lengthy orders, copies are obtained from the Clerk's office at the cost of $1.00 per page.

(c) When rights of way and easements, etc. are recorded referring to the original 6,000 plus acres comprising Reston, it is necessary to determine which of the original acreage parcels is affected. Then it is necessary to determine whether the property is presently subdivided and dedicated as a section including the many resubdivisions. This will provide an up to date record of which easements and rights of way affect any area or property in Reston.

(d) Instruments such as Gulf repurchase deeds and plats, subdivisions, ease-

ment agreements, etc. are reviewed for recording. Also a comparison is made of the metes and bounds description with courses and distances on the plat to ascertain that there are no discrepancies between the two.

(e) Unrecorded instruments furnished by Gulf Reston, Inc., Vepco, C & P Telephone, Reston Transmission, etc. are checked as to each parcel or lot being examined.

(f) Each subdivision section is broken down into blocks and block lists (as to lot) and checked against grantor list to see that the duplicate lot numbers are not recorded. If errors are found, attorney who recorded the erroneous description is notified and asked to correct same.

(g) Answer any questions as to recording data, etc. requested by Reston Engineering Department.

(h) When recording deeds and deeds of trust in the individual owner after closing, the grantor list is checked again, judgments in four different sets of judgment records are checked again and unindexed instruments in as many as four different places are also rechecked. Next, it is usually necessary to wait in line to record. Once this is accomplished, it is necessary to conform copies as to instrument number, time of recording and deed book and page numbers.

If judgment such as Internal Revenue Service, maintenance and support, etc. or any other problems are discovered, the responsible attorney must consider and determine whether the instrument can be recorded or whether the problem must first be resolved. The Gulf Reston, Inc., Palindrone Corporation and Reston, Va., Inc. lists must be checked and rechecked on every piece or parcel of property being examined up to the minute of recording as they reserve the right to grant subsequent rights of way. This also applies to each resale from one individual to another. Similarly, the Gulf Reston, Inc. record must always be rundown as though they were still the owner.

For each plat, including all notations of any type, rights of way, resubdivisions, easement agreements, etc. must be checked as to each lot or parcel.

(i) It may be necessary to conform copies in various "section files" and update title front sheets in subdivision and individual lot files.

(j) The recording deeds of dedication, resubdivisions, etc. is time consuming as it is necessary to go to the Massey Building (County Office Building in Fairfax) to accomplish the following:

(1) Each dedication must be approved by the county attorney's office on the 11th floor;

(2) Pick up the approved plat from the 7th floor;

(3) Pay any unpaid fees—7th floor;

(4) Return to the Clerk's office at the courthouse, check wach list and entry thereon;

(5) Check all the unindexed instruments, frequently as many as 50 to 80 in number;

(6) Wait in line to record and then record;

(7) Obtain recorder's receipt and fill in time, instrument number, etc., and then conform copies;

(8) Wait for the deed book and page numbers, frequently for as long as an hour or more. (Trial Testimony.)

(38) In certifying a title to real property, an attorney becomes the person ultimately liable in the event a defect is subsequently discovered. This is true even if the purchaser of the real estate secures title insurance for, in that event, the attorney's certification is to the title insurance company. If the attorney has made an error in examining or evaluating the title, the purchaser of the real estate is protected by his insurance company which, in turn, is entitled to proceed against the attorney for any error in the certification. Accordingly, the attorney bears the ultimate responsibility, ethically and financially, for the examination and certification of a title in

any transfer of real property. Furthermore, the liability of the attorney is not limited by the purchase price of the property, but increases over the years as the value of the property increases, either through inflation or appreciation. (Trial Testimony.)

(49) Defendant Fairfax Bar Association does not examine and certify titles to real property or provide legal services of any kind. (Trial Testimony.)

(54) There is no evidence that the promulgation of an advisory minimum fee schedule by the Fairfar Bar Association has affected prices adversely to consumers. (Trial Testimony.)