Lewis H. GOLDFARB and Ruth S. Goldfarb, Appellants,

v.

VIRGINIA STATE BAR and Fairfax County Bar Association, Appellees.

Lewis H. GOLDFARB and Ruth S. Goldfarb, Appellees,

v.

FAIRFAX COUNTY BAR ASSOCIATION, Appellant.

Nos. 73-1247, 73-1248.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 7, 1973.

Decided May 8, 1974.

2

Alan B. Morrison, Washington, D. C.
(W. Thomas Jacks, Washington, D. C.,
on brief) for appellants in No. 73–1247
and for appellees in No. 73–1248.

Stuart Dunn, Asst. Atty. Gen. of Virginia, (Andrew P. Miller, Atty. Gen. of
Virginia, and T. J. Markow, Asst. Atty.
Gen., of Virginia, on brief) for appellee
in No. 73–1247. Lewis T. Booker, Richmond, Va. (John H. Shenefield, T. S. Ellis, III, Hunton, Williams, Gay & Gibson,
Richmond, Va., on brief) for appellant in
No. 73–1248.

Before BOREMAN, Senior Circuit
Judge, CRAVEN and FIELD, Circuit
Judges.

BOREMAN, Senior Circuit Judge:

This is a class action brought by Lewis and Ruth Goldfarb on behalf of themselves and certain other homeowners in
Reston, Virginia, against the Virginia
State Bar (State Bar) and the Fairfax
County Bar Association (Association) [1]

1. This action originally named the Arlington County Bar Association and the Alexandria Bar Association as additional codefendants. These two codefendants agreed to a consent judgment whereby they were directed to cancel their existing fee schedules and were enjoined from publishing future fee schedules.

**4**

to recover treble damages for violation of the federal antitrust laws. They allege that the State Bar and the Association have conspired to restrain interstate commerce through the use of fixed fees. Commencing with State Bar Opinion 98 issued on June 1, 1960, the State Bar announced its intention to discipline any attorney who repeatedly charged less than the fees set forth in the minimum fee schedule adopted by his *local* bar association when motivated by a desire to "increase his practice with resulting personal gain." In 1962 and again in 1969 the State Bar published a "Minimum Fee Schedule Report" intended for the guidance of local bar associations in establishing minimum fee schedules. On June 12, 1969, the Fairfax County Bar Association promulgated a "Minimum Fee Schedule" which closely followed the guidelines set forth by the State Bar. The "Minimum Fee Schedule" was described as "advisory" and was never circulated to Association members; members who desired a copy of the schedule had to specifically request it at the Fairfax County Courthouse. Nevertheless the fee schedule states that "consistent and intentional violation of the suggested minimum fee schedule for the purpose of increasing business can, under given circumstances, constitute solicitation" and result in disciplinary action as provided in State Bar Opinion 98. No disciplinary action has been brought against any member of the Association for failure to adhere to the fee schedule, although the right of the State Bar to do so was reaffirmed in State Bar Opinion 170 issued on May 28, 1971.

On October 26, 1971, the Goldfarbs contracted to purchase a home in Reston, Virginia. To finance the purchase of the home the Goldfarbs secured a home mortgage. The mortgagee required the Goldfarbs to purchase title insurance; this necessitated the employment of a Virginia attorney to conduct a title examination of the real estate to be purchased.

The Goldfarbs contacted numerous attorneys in Northern Virginia in an attempt to secure the necessary legal services at the lowest possible cost.[2] The record demonstrates that the Goldfarbs were unable to secure these services at a rate less than that prescribed by the "Minimum Fee Schedule." We accept the finding of the district court that "[a] significant reason for the inability of the Goldfarbs to obtain legal services for the examination of the title to their home for less than the fee set forth in the Minimum Fee Schedule . . . was the operation of the minimum fee schedule system."[3]

The district court severed the question of liability from that of damages. As to the State Bar the court found no liability and the Goldfarbs have appealed that decision. The court held that the Association had violated the federal antitrust laws and was liable for damages, if any, sustained by members of the plaintiff class. The Association has appealed from that decision.

These appeals have been consolidated for consideration by this court. We first address our attention to the contentions of the Goldfarbs with respect to the State Bar and then proceed to consideration of the issues raised by the Association in its appeal.

## I. The Parker v. Brown Exemption
### Part A—The State Bar

The Goldfarbs complain of the issuance of the 1962 and 1969 fee schedule reports by the State Bar. They also question the validity of State Bar Opinions 98 and 170 which in effect state

2. On the lighter side we note in passing that it appears that the Goldfarbs were actively seeking what might be termed "inexpensive assistance of counsel." This should not be confused with "ineffective assistance of counsel," a term often found in Habeas Corpus petitions. We do not find it necessary to consider whether, in any sense, these terms might bear some relationship, one to the other.

3. The opinion of the district court is reported at 355 F.Supp. 491 (E.D.Va.1973).

that it is unethical for an attorney to habitually charge less than the fee called for in an established fee schedule. Plaintiffs contend that the fees charged for legal services incident to the purchase of a home in Northern Virginia have been raised, fixed and maintained at an artificial and noncompetitive level by the State Bar's activities. It is asserted that such activities are in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.[4]

The district court concluded that the State Bar had not violated the Sherman Act. The court held that the State Bar had acted within the scope of its statutory or rule created authority. Citing Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), in support of its determination that the State Bar was not liable under the Sherman Act, the district court stated:

"The rationale behind the holding of Parker v. Brown, supra, that the Sherman Act restrains only actions of private persons and not state action, applies equally to both a state's judicial actions and its legislative actions."

Goldfarb v. Virginia State Bar, 355 F. Supp. 491, 496 (E.D.Va.1973).

Prior to undertaking to apply the standards of the Parker exemption to the facts of this case we deem it advisable to consider the facts and holdings of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), as well as those in Asheville Tobacco Board of Trade, Inc. v. F.T.C., 263 F.2d 502 (4 Cir. 1959), and Washington Gas Light Co. v. Virginia Electric & Power Co., 438 F.2d 248 (4 Cir. 1971).

In Parker a state agricultural proration program for the raisin industry was alleged to be in conflict with federal antitrust laws. Noting the significance of the raisin industry and agriculture in general to the economy of the State, the California Legislature passed the California Agricultural Prorate Act[5] to insure stability in the marketing of agricultural commodities produced in the State. Brown, a producer and packer of raisins, complained that the programs and policies initiated in response to the Prorate Act violated the Sherman Act. The Court held that the programs were permissible, even assuming the action would have been violative of the antitrust laws had the same plan been adopted by private individuals operating without a legislative mandate.

"But it is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its *authority* and its *efficacy* from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature."

Parker v. Brown, 317 U.S. 341, 350–351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943) (accent added). The Court emphasized that the Sherman Act prohibited *individual* action and not *state* action. Applying this principle to the facts of Parker, the Court noted that it was the State which had created the machinery for establishing the prorate program. It was the State, acting through the Agricultural Prorate Advisory Commission,[6] which had adopted the

4. 15 U.S.C. § 1 provides, in part:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

5. Act of June 5, 1933, ch. 754, Statutes of California of 1933, as amended by chs. 471 and 743, Statutes of 1935; ch. 6, Extra Session, 1938; chs. 363, 548 and 894, Statutes of 1939; and chs. 603, 1150 and 1186, Statutes of 1941.

6. The Commission consisted of nine members. The Director of Agriculture, a state official, was an *ex officio* member. The other eight members were appointed to four

**6**

program and enforced it with penal sanctions in the execution of a governmental policy.

The *Parker* decision contains cautionary language directed at the states. A state cannot grant immunity to those who violate the Sherman Act by authorizing the violations, or by declaring that their action is lawful.[7] The question then arises: what factors are important in determining if state legislation creates a valid state action exemption or merely creates a shelter for immunity from the Sherman Act.

The *Parker* Court considered three factors in deciding that the California Agricultural Prorate Act was valid state action. First, the Court noted that the declared purpose of the Act was to conserve the agricultural wealth of the State and prevent its economic waste.[8] Thus, the Act was for the benefit of the public;[9] its purpose was not to give an unfair advantage or monopolistic position to producers and sellers. Secondly, the Court stressed that the regulation of the industry was actively

and continually supervised by the State through its Commission.[10] Finally, the Court emphasized that the program received its authority and efficacy from the legislative command. The State conceived the theory of control and then created the machinery for the program.[11] The Act itself gave state officials the *power* to restrict competition among the growers and maintain certain price levels.[12] The satisfaction of these three factors is essential to establish and support a valid claim of the *Parker* exemption.

In Asheville Tobacco Board of Trade, Inc. v. F. T. C., 263 F.2d 502 (4 Cir. 1959), this court refused to apply the *Parker* exemption to local tobacco boards of trade. For many years tobacco boards of trade existed at common law in North Carolina by common consent or by contract among the interested individuals. The various boards exercised their power to promulgate regulations governing auction sales of tobacco. Finally the Legislature of North Carolina passed N.C.Gen.Stat. § 106–465[13] au-

---

year terms by the Governor and confirmed by the State Senate. All members were required to take an oath of office.

7. "But such action must be state action, not individual action masquerading as state action." Asheville Tobacco Board of Trade, Inc. v. F.T.C., 263 F.2d 502, 509 (4 Cir. 1959).

8. Parker v. Brown, 317 U.S. 341, 346, 63 S. Ct. 307, 87 L.Ed. 315 (1943).

9. As a general proposition courts will not consider benefits flowing to the public when applying the Sherman Act to contracts, combinations or conspiracies among individuals.
 The decisions we have cited conclusively demonstrate that the prohibitions of the statute [Sherman Act] apply even though the parties to a contract indulge the belief that the agreement may have beneficial results and actually show that in some respects the public is benefited thereby. Congress has determined that the greater good is served by the maintenance of free competition and its decision in the field of interstate commerce must control.
 Pennsylvania W. & P. Co. v. Consolidated G., E.L. & P. Co., 184 F.2d 552, 559 (4 Cir. 1950).

It is apparent from *Parker*, however, that courts should take cognizance of the benefits accruing to the public when a state is involved in the regulation of an industry.

10. Parker v. Brown, 317 U.S. 341, 352, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

11. *Id.* at 350 and 352.
 It is interesting to note that it was not a case where individuals initially decided to take action, conspired to regulate competition and prices in the industry, and then received governmental approval through legislative action. On its surface such a sequence of events would appear to be an attempt by a state to grant immunity to those violating the Sherman Act. Indeed such "after the fact" legislation may create a rebuttable presumption that the state was attempting to camouflage individual action as state action.

12. *Id.* at 346.

13. N.C.Gen.Stat. § 106–465 provides in part:
 Tobacco warehousemen and the purchasers of leaf tobacco, at auction, on warehouse floors, are hereby authorized to organize . . . tobacco boards of trade in the several towns and cities in North Carolina in which leaf tobacco is sold on warehouse floors, at auction.

thorizing local tobacco boards of trade to make reasonable rules and regulations for the economic and efficient handling of the sale of leaf tobacco at auction. The Act did not authorize the control of prices or the making of rules and regulations in restraint of trade. The complained of activity concerned the Asheville Tobacco Board of Trade's regulations governing the allotment of selling time to warehouses.[14] The F.T.C. held that the regulations violated the intent and meaning of § 5 of the Federal Trade Commission Act.[15] On appeal the Asheville Board contended that its activities were exempt under the rationale of *Parker*. In refusing to apply the *Parker* exemption this court concluded that the regulations and activities were not state action but were individual activities subject to the jurisdiction of the F.T.C.

In both *Parker* and *Asheville* there was legislation concerning an industry important to the state and yet the courts reached opposite results. However, the cases are reconcilable. The key feature distinguishing the cases is North Carolina's failure to heed the cautionary language of *Parker*.[16] Keeping in mind the three factors helpful in determining whether state legislation creates a valid state action exemption or merely creates a shelter for immunity from the antitrust laws, it is obvious from the facts

of *Asheville* that the *Parker* exemption was not applicable. In *Parker* the declared purpose of the legislation was to conserve and economically use California's agricultural resources; the benefits of the Act accrued to the public. In *Asheville,* although the legislation involved an industry important to the State, the thrust of the Act concerned the self-regulation of auction procedures by warehousemen, sellers and buyers; that Act was not aimed at benefiting the public in any meaningful way. "A tobacco board of trade is organized primarily for the benefit of those engaged in the business . . . ."[17] In *Parker* the regulation of the industry was actively supervised by state officials. N.C.Gen.Stat. § 106–465 did not provide for any supervision by a state agency or official. "They [the boards] are not accountable to the State, and are not supervised in any manner by State officials."[18] This court in *Asheville* noted that the only possible state involvement was the legislative act condoning the work of the boards and several court decisions involving disputes among members of the various boards. The court reasoned that this was not the active state supervision required by *Parker*. Finally, in *Parker* the program received its authority and efficacy from legislative command. In *Asheville* the

Such tobacco boards of trade as may now exist, or which may hereafter be organized, are authorized to make reasonable rules and regulations for the economical and efficient handling of the sale of leaf tobacco at auction on the warehouse floors . . . .

Nothing in this section shall authorize the organization of any association having for its purpose the control of prices or the making of rules and regulations in restraint of trade.

14. A warehouse owned by C. T. Day was handling twenty to twenty-five percent of the leaf tobacco sales in Asheville. Because of the Board's regulations, however, Day's warehouse was only allotted eight to nine percent of the total selling time. Both Day and the F.T.C. claimed the regulations were directly restraining his trade.

15. 15 U.S.C. § 45.
Although the *Asheville* case involved the Federal Trade Commission Act instead of the Sherman Act, the latter being the controlling statute in *Parker* and in the instant case, that fact had no bearing on the ultimate result. It appears that the exemption can be applied regardless of the specific antitrust law involved.

16. [A] state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful . . . .
Parker v. Brown, 317 U.S. 341, 351, 63 S.Ct. 307, 314, 87 L.Ed.2d 315 (1943).

17. Asheville Tobacco Board of Trade, Inc. v. F.T.C., 263 F.2d 502, 509 (4 Cir. 1959).

18. *Id.* at 510.

8

regulations and controls on auction procedures were initially conceived and given effect by the interested individuals. Only at a later point in time did the Legislature approve such activities,[19] and even then the Act specifically denied the boards the power to restrict competition.[20] Viewing the cases in this light, *Asheville*, even though reaching a contrary result, bolsters our reading and understanding of *Parker*.

■ One further point found in *Asheville* is helpful in any analysis of the *Parker* exemption. In *Asheville* the court held that:

"It [the state] may even permit persons subject to such control to participate in the regulation, provided their activities are adequately supervised by independent state officials." [21]

Thus a legislature may grant to private individuals, the ones subject to control and regulation, the power to conduct the day to day operations of the program. Those individuals may even promulgate and enforce the regulations that control them, provided their activities are *adequately supervised by independent state officials*.

In Washington Gas Light Co. v. Virginia Electric & Power Co., 438 F.2d 248 (4 Cir. 1971), one issue was whether certain predatory promotional activities of Virginia Electric & Power Co. (VEPCO) were sufficiently regulated by a state agency, the State Corporation Commission (SCC), to qualify under the *Parker* exemption. Although the Virginia Legislature ultimately controls domestic public utilities,[22] the day to day regulation and control of that industry are conducted by SCC. VEPCO,

through an agressive installation campaign, had made significant inroads into areas previously dominated by natural gas. Washington Gas Light Co. claimed these activities placed VEPCO in violation of the Sherman Act. On appeal VEPCO argued that the *Parker* exemption applied. The court discussed *Parker, Asheville* and other cases in concluding that the utility's activities regulated by SCC did fall within the exemption. The court noted that there was no doubt that SCC was an arm of the State, possessing both the authority and power to regulate through legislative command, and that requirement of *Parker* was thus met. It was also clear that regulation of giant utility concerns was for the protection of the public. The most difficult question, however, concerned the remaining cautionary factor of *Parker*: whether there was the sufficient state supervision.[23] Washington Gas Light Co. argued that SCC's inaction, its failure to give approval or disapproval of VEPCO's activities, made the actions of VEPCO those of an individual and not those of the State. The court responded:

"The argument is not without merit but the conclusion is not inevitable unless one equates administrative silence with abandonment of administrative duty. It is just as sensible to infer that silence means consent, i. e., approval." [24]

Having discussed the *Parker* exemption at length we consider the facts of the case before us. The Legislature of Virginia has determined that the practice of law within the State should be controlled and regulated by the Virginia Supreme Court of Appeals (Virginia court). Virginia Code Ann. § 54–48

19. Such a sequence of events is in stark contrast to the facts of *Parker*. See note 11, *supra*. Although not specifically mentioned, the *Asheville* court appears to have inferred that such "after the fact" legislation was an attempt by the State to camouflage individual action as state action.

20. See note 13, *supra*.

21. 263 F.2d at 509.

22. Va.Code Ann. § 56–2 (Michie 1969 Replacement Volume).

23. Parker v. Brown, 317 U.S. 341, 352, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

24. Washington Gas Light Co. v. Virginia Electric & Power Co., 438 F.2d 248, 252 (4 Cir. 1971).

(Michie 1972 Replacement Volume), provides:

"The Supreme Court of Appeals may, from time to time, prescribe, adopt, promulgate and amend rules and regulations:

(a) Defining the practice of law.

(b) Prescribing a code of ethics governing the professional conduct of attorneys at law and a code of judicial ethics.

(c) Prescribing procedure for disciplining, suspending, and disbarring attorneys at law."

The Legislature then established an administrative agency, presumably to relieve the Virginia Court of the day to day supervision and regulation of the legal profession. The State Bar is the administrative agency of the Virginia court. By enacting Va.Code Ann. § 54–49 (Michie 1972 Replacement Volume), the Legislature authorized the Virginia Court to "prescribe, adopt, promulgate and amend rules and regulations organizing and governing the association known as the Virginia State Bar, composed of the attorneys at law of this State, to act as an administrative agency of the Court . . . ."[25]

Paraphrasing, some of the pertinent stipulations of the parties here are as follows:

The Virginia statutes have given the Virginia court authority to make questions involving suggested fee schedules and economic reports of the State Bar questions of ethics under the laws of Virginia.

The Virginia court has stated that suggested fee schedules and economic reports of the State Bar involve questions of ethics and that the State Bar has the authority to issue opinions on such ethical matters.

The State Bar has been given authority by the Virginia court to issue opinions similar to Opinions 98 and 170, which relate to minimum fee schedules, and to disseminate minimum fee schedule reports.

From the stipulations it is clear that the Legislature has made suggested fee schedules and economic reports a part of the regulatory power of the Virginia court and its administrative agency, the State Bar. Indeed, such matters have been regulated by issuance of two fee reports and Opinions 98 and 170.

In the instant case, as with *Parker* and *Asheville*, there is state legislation concerning an "industry" important to the state.[26] Thus, our initial concern is whether Virginia has heeded the cautionary language of *Parker*.

The Virginia Legislature has provided for regulation of attorneys through a code of ethics governing professional conduct. That code's *primary* functions are to protect rights and interests of clients and to instill public confidence in the legal profession and our system of justice.[27] We would be less than candid

---

25. Va.Code Ann. § 54–49 (Michie 1972 Replacement Volume), also provides that the State Bar should be an integrated bar, *i. e.*, all persons practicing law in the State are required to be members. § 54–50 allows the Virginia court to assess annual fees to practicing lawyers in the State. These fees are paid into the Virginia Treasury, credited to the State Bar Fund (§ 54–52) and used in administering the regulatory functions of the State Bar.

26. Both government and individuals rely on the legal profession for guidance in their daily transactions. The practice of law is essential to the smooth functioning of our socio-economic system, a system based on the theory of "rule by law." Indeed, a responsible legal "industry" is vital to Virginia and every state of the Union. The parties have not argued to the contrary.

27. It is apparent from a reading of the nine Canons that the Virginia Code of Professional Responsibility is primarily for the benefit of the public and especially for those members of the public who become clients of attorneys. The Canons are statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers in their relationship with the public and the legal system. They embody the general concepts from which the Ethical Considerations and the Disciplinary Rules of the ethics-code are derived.

(1) A lawyer should assist in maintaining the integrity and competence of the legal profession.

if we did not admit that lawyers, those who are regulated, benefit from certain provisions of the Code of Professional Responsibility. We cannot ignore the fact that in some instances adherence to a suggested minimum fee schedule is financially helpful to the individual attorney. Still, minimum fee schedules are only one factor among a multitude of variables that interrelate to provide the public with competent legal service.[28] It is probable that the raisin growers and sellers in *Parker* received some spin-off benefits from certain sections of the Agricultural Prorate Act. The point is that the regulation there was aimed primarily at benefiting the public. In *Asheville* the regulations involved were primarily for the benefit of those regulated; the public received little, if any, tangential benefits. It is clear that the desired goal of the Code of Professional Responsibility is to benefit clients and the public in general.[29] It is manifestly unfair to dissect a state's regulatory program into its various component parts, parts that were meant to interrelate, and then to declare that, because some factors may benefit those to be regulated, the program falls outside the *Parker* exemption.[30] Since the primary benefits of the regulation of lawyers ac-

---

(2) A lawyer should assist the legal profession in fulfilling its duty to make legal counsel available.

(3) A lawyer should assist in preventing the unauthorized practice of law.

(4) A lawyer should preserve the confidences and secrets of a client.

(5) A lawyer should exercise independent professional judgment on behalf of a client.

(6) A lawyer should represent a client competently.

(7) A lawyer should represent a client zealously within the bounds of the law.

(8) A lawyer should assist in improving the legal system.

(9) A lawyer should avoid even the appearance of professional impropriety.

For a detailed discussion of the Canons and more specifically the Ethical Considerations and Disciplinary Rules see Rules of the Supreme Court of Appeals of Virginia, Part 6, § I–II (as amended Jan. 1, 1971).

28. It is interesting to note what a minuscule part suggested fees play in the total scheme of regulation. The Virginia Code of Professional Responsibility is divided into nine major sections, each headed by one of the Canons listed in note 27, *supra*. Under each of the nine Canons there are Ethical Considerations (advisory in nature) and Disciplinary Rules (mandatory in nature). Concentrating on the Disciplinary Rules, those that attorneys must follow, we note that they are broken down further into various sections and subsections. To find reference to minimum fees in the Disciplinary Rules we must look to Canon 2. The Disciplinary Rules of that Canon have ten major divisions. (DR 2–101 to DR 2–110). DR 2–106 has three subdivisions. Under subdivision (B) there are eight separate sections. Section 3 refers to minimum or customary fees charged in the locality. Clearly minimum fees play but a small part in the total picture of regulation of the "industry." For a more detailed listing of the sections of DR 2–106 see note 30, *infra*.

29. Our conclusion that the ethics code primarily benefits the public is bolstered by the logic of the United States Supreme Court in Lathrop v. Donohue, 367 U.S. 820, 843, 81 S.Ct. 1826, 1838, 6 L.Ed.2d 1191 (1961).

> Both in purport and in practice the bulk of State Bar activities serve the function, or at least so Wisconsin might reasonably believe, of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State . . . . It cannot be denied that this is a legitimate end of state policy.

Additional support can be found in the case of Semler v. Oregon Bd. of Dental Examiners, 294 U.S. 608, 612, 55 S.Ct. 570, 572, 79 L.Ed. 1086 (1935).

> The community is concerned with the maintenance of professional standards which will insure not only competency in individual practitioners, but protection against those who would prey upon a public peculiarly susceptible to imposition through alluring promises . . . . And the community is concerned in providing safeguards not only against deception, but against practices which would tend to demoralize the profession by forcing its members into an unseemly rivalry which would enlarge the opportunities of the least scrupulous. What is generally called the "ethics" of the profession is but the consensus of expert opinion as to the necessity of such standards.

30. Such a myopic view can be misleading. Although minimum fees may in some cases provide more than adequate compensation for services rendered, their appearance in DR 2–106 is for the purpose of establishing

crue to the public, the first factor considered under the cautionary language of *Parker* has been satisfied here.

The second factor to be considered is whether there is *active* supervision by *independent* state officials. In *Parker* the supervising body was composed of the Director of Agriculture and eight members appointed by the Governor. They actively supervised the prorate program and the Court concluded that this factor had been satisfied. In *Asheville, supra,* the regulatory body was composed of members neither elected nor appointed; there were no independent state officials regulating the program and there was no active state supervision. In the instant case, the State Bar, which is designated by statute as the controlling state agency, is composed of those to be regulated.[31] It is doubtful that the State Bar, standing alone, could be viewed as the type of independent regulatory agency called for in *Parker*. This court in *Asheville* said that a state could allow those persons subject to controls to participate in the regulation, *provided* their activity is adequately supervised by independent state officials. Applying this proviso of *Asheville*, there is no question that the Judges of the

Virginia court are sufficiently *independent*. Still, to meet this requirement of *Parker* the Virginia court must *actively* supervise the State Bar. It is stipulated that the Virginia court initially gave authority to the State Bar to issue suggested fee schedules and opinions similar to Opinions 98 and 170 concerning adherence to the schedules. The Virginia court also officially adopted the Code of Professional Responsibility. From time to time the Virginia court has employed suggested fee schedules in establishing attorney fees in cases before it. Finally, the Virginia court's inaction with regard to specifically approving or disapproving the schedules in question should not be construed as a failure to adequately supervise. Adopting and applying the logic found in *Washington Gas Light*, one should not equate silence with abandonment of the duty to supervise. "It is just as sensible to infer that silence means consent, i. e., approval." [32] The Virginia court has the authority to regulate and supervise the State Bar; we will not infer abandonment of that authority because of claimed inactivity. The active independent state supervision required in *Parker* is provided here by the Virginia court.

---

*reasonable* fees. The ethics code states that it is necessary to establish what is a reasonable fee to insure that clients are not charged an excessive fee. In part, the Virginia Code of Professional Responsibility DR 2–106 (Jan. 1, 1971), provides:

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

(B) A fee is clearly excessive when, after a review of the facts a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) *The fee customarily charged in the locality for similar legal services.*

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent. [Emphasis added.]

31. The State Bar is controlled by its Council, composed of six members appointed by the Supreme Court of Virginia, and the President, the immediate Past-President, and the President-Elect of the State Bar, as *ex officio* members; additional members of the Council, composing the bulk of the membership, are elected by lawyers from the judicial circuits of State.

32. Washington Gas Light Co. v. Virginia Electric & Power Co., 438 F.2d 248, 252 (4 Cir. 1971).

**12**

We have little difficulty in finding the presence of the third factor to be considered in light of the cautionary language of *Parker*. The parties have stipulated that the regulation program here received its authority and efficacy from legislative command. The Act involved gave the Virginia court the power to restrict competition among those in the legal profession. The Virginia Legislature created the machinery for regulation. Lawyers did not conceive and implement the plan and then seek "after the fact" legislative acceptance as was the case in *Asheville*.

■ We find state action here concerning a business important to the State. From the foregoing analysis it is apparent that Virginia has heeded the cautionary language of *Parker*. Here we are not considering sham legislation granting immunity to those who violate the Sherman Act. The State Bar avoids liability under the Sherman Act because of the *Parker* exemption.

### Part B—Fairfax County Bar Association

■ The Fairfax County Bar Association is a voluntary organization composed of members of the State Bar practicing in Fairfax County, Virginia. The Association is a private organization and does not derive its authority or efficacy from the State. While it is clear that the State Bar recognizes local bar associations it does not regulate or supervise local bar activities.

Pursuant to the suggestion of the State Bar in its "Minimum Fee Schedule Report" the Fairfax County Bar Association published a "Minimum Fee Schedule." Although described as "voluntary" by the Association it is clear from the record that all or nearly all of the Association's members charged fees equal to or exceeding the fees set forth in the schedule for title examinations and other services involving real estate. The Association has no power to discipline violators but has clearly relied upon and reinforced the State Bar's threat to discipline habitual violators of locally established minimum fee schedules.

The district court held that the Association was in violation of the Sherman Act, 15 U.S.C. § 1. With respect to jurisdiction the court found that the real estate services provided by members of the Association sufficiently affected interstate commerce to warrant federal jurisdiction under the Sherman Act. The court specifically found that the Association was engaged in a form of price-fixing and that it was not exempt from prosecution under the *Parker* exemption or the "learned profession" exemption.

On appeal it has been argued by the Association that the *Parker* exemption should be extended to cover the Association's activities. Applying the three factors from the cautionary language of *Parker*, we note first that the Association has been engaged in the same basic activities as the State Bar. We have no doubt that the primary aim of those activities was to benefit the public just as it was the aim of the State Bar. However, the remaining cautionary requirements of *Parker* were not satisfied by the Association. The Fairfax County Bar Association's regulatory activities are not founded on a legislative command as are the activities of the State Bar. More fatal to the application of *Parker* to the Association is the fact that there is no active independent state supervision. The Virginia court has no direct control over local bar associations. Although the Virginia court could eventually pass judgment on local bar activities, the process might entail lengthy court proceedings. The active independent state supervision required in *Parker* to insure that abuses do not occur within a regulatory scheme would be absent. We decline to extend the *Parker* exemption to the Fairfax County Bar Association.

On appeal the Association also contends that the legal profession is a "learned profession," that it is not subject to the antitrust laws and that the activities complained of do not restrain

interstate trade. We find it necessary to consider the allegations of the Goldfarbs and the facts as found by the district court in some detail to resolve these issues on appeal.

The Goldfarbs contend that the Association by promulgation of the minimum fee schedule has restrained trade or commerce among the several states in violation of the Sherman Act. They allege (1) that the fee schedule restrains attorneys in the practice of their profession resulting in artificially high fees, and (2) that the fee schedule restrains those engaged in the financing and insuring of home mortgages by arbitrarily inflating a component part of the cost of securing housing. We discuss separately each of these alleged forms of restraint.

## II. The "Learned Profession" Exemption

It is abundantly clear from the record before us that the fee schedule and the enforcement mechanism supporting it act as a substantial restraint upon competition among attorneys practicing in Fairfax County. The question before us, however, is whether this is a "restraint of trade or commerce among the several States" and therefore a violation of the Sherman Act.

Throughout the development of federal antitrust law there has been judicial recognition of a limited exclusion of "learned professions" from the scope of the antitrust laws. This exclusion is not a favor bestowed upon professionals by the courts as a "professional courtesy"; the exclusion arises from the language of the statutes and the peculiar nature of the services rendered.

The Sherman Act declares that every "restraint of trade or commerce among the several States" is illegal. Restraints upon the practice of law are not illegal *per se* because that which is restrained (*i. e.*, the practice of a "learned profession") is neither trade nor commerce. The "learned profession" exemption rests upon two cases decided by the United States Supreme Court. Those cases hold that one engaged in the practice of a profession "follow[s] a profession and not a trade"[33] and that such "personal effort, not related to production, is not a subject of commerce."[34] Even when the Supreme Court substantially expanded the scope of the Sherman Act by defining trade in its broadest sense, it recognized that the practice of a "learned profession" is not a trade.[35] While more recent decisions of the Supreme Court have refused to pass upon the validity of

33. Federal Trade Comm'n v. Raladam Co., 283 U.S. 643, 653, 51 S.Ct. 587, 592, 75 L. Ed. 1324 (1931) (construing the Federal Trade Commission Act, 15 U.S.C. § 45, with reference to the Sherman Act, 15 U.S.C. §§ 1–7, and the Clayton Act, 15 U.S.C. §§ 12 et seq.).

34. Federal Baseball Club, Inc. v. National League of Professional Baseball Clubs, 259 U.S. 200, 209, 42 S.Ct. 465, 466, 66 L.Ed. 898 (1922); *see also* United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 573, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944) (dissenting opinion of Chief Justice Stone).

35. Mr. Justice Sutherland in construing the phrase "restraint of trade" as it appears in § 3 of the Sherman Act quoted with approval the following statement of Mr. Justice Story in The Schooner Nymph, 18 F.Cas. p. 506 (No. 10,388):

"The argument for the claimant insists, that 'trade' is here used in its most re-

strictive sense, and as equivalent to traffic in goods, or buying and selling in commerce or exchange. But I am clearly of opinion, that such is not the true sense of the word, as used in the 32d section. In the first place, the word 'trade' is often, and indeed generally, used in a broader sense, as equivalent to occupation, employment, or business, whether manual or mercantile. Wherever any occupation, employment, or business is carried on for the purpose of profit, or gain, or a livelihood, not in the liberal arts or in the learned professions, it is constantly called a *trade*."

Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 436, 52 S.Ct. 607, 610, 76 L.Ed. 1204 (1932). While that case was decided under Section 3 of the Sherman Act and the allegations in the instant case relate to Section 1, we see no reason to assign a different meaning to the word "trade" as it appears in Section 1.

the "learned profession" exemption,[36] we find nothing to suggest that it should not continue to be applied in appropriate cases. Lower federal courts have continued to recognize and apply this exemption.[37]

■ It is not difficult to understand why the learned professions have been treated differently than other occupations by the courts with respect to the antitrust laws. As Justice Jackson, speaking for the Court in United States v. Oregon State Medical Society, 343 U. S. 326, 336, 72 S.Ct. 690, 697, 96 L.Ed. 978 (1952), said, "forms of competition usual in the business world may be demoralizing to the ethical standards of a profession." The legal profession has rejected the maxim of caveat emptor as

a standard of conduct.[38] Unlike the mechanic or the butcher, a lawyer has a professional duty to provide his services at a reduced rate to those who need but cannot afford his services.[39] Advertising and other forms of solicitation of business common to trade and commerce are criminal acts when utilized by lawyers.[40] In view of the special form of regulation already imposed upon those in the legal profession the courts have been reluctant to superimpose upon the profession the sanctions of the antitrust laws, many of which are in direct contravention of existing legal and ethical restrictions.[41]

■ We believe that much of the criticism of this "learned profession" exemption is the result of a misunderstan-

36. American Medical Ass'n v. United States, 317 U.S. 519, 528, 63 S.Ct. 326, 328, 87 L.Ed. 434 (1943) ("Much argument has been addressed to the question whether a physician's practice of his profession constitutes trade under § 3 of the Sherman Act. . . . [W]e need not consider or decide this question."); United States v. National Ass'n of Real Estate Bds., 339 U.S. 485, 491–492, 70 S.Ct. 711, 715, 94 L.Ed. 1007 (1950) ("we do not intimate an opinion on the correctness of the application of the term [trade] to the professions.").

37. Riggall v. Washington County Medical Soc'y, 249 F.2d 266, 268 (8 Cir. 1957); Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges and Secondary Schools, Inc., 139 U.S.App.D.C. 217, 432 F.2d 650, 654 (1970).

38. A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.
Canon 5, Virginia Code of Professional Responsibility, DR 5–104(A).
A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.
Canon 2, Virginia Code of Professional Responsibility, DR 2–106(A).

39. The basic responsibility for providing legal services for those unable to pay ultimately rests upon the individual lawyer . . . Every lawyer, regardless of professional prominence or professional workload, should find time to participate in serving the disadvantaged.

Canon 2, Virginia Code of Professional Responsibility, EC 2–25.
It is customary in many jurisdictions to appoint lawyers for indigent criminal defendants by selecting lawyers at random from those practicing before the court. Agreement to accept such employment at the statutory rate, even if less than the schedule fee or the appointed attorney's customary fee, is often a condition of admission to practice before the court.

40. The common law crimes of barratry, maintenance, and champerty are recognized in Virginia and have been codified in Code of Virginia §§ 18.1–388 through 18.1–400 (Michie 1960 Replacement Volume). Although the statutory provisions relating to maintenance and champerty were declared unconstitutional in National Ass'n for the Advancement of Colored People v. Harrison, 202 Va. 142, 116 S.E.2d 55 (1960), the court made it clear that maintenance and champerty continue to be illegal under Code of Virginia §§ 54–74, 54–78, and 54–79 (Michie 1972 Replacement Volume), insofar as solicitation is involved.

41. [T]he proscriptions of the Sherman Act were 'tailored . . . for the business world,' not for the noncommercial aspects of the liberal arts and the learned professions.
Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc., 139 U.S.App.D.C. 217, 432 F.2d 650, 654 (1970) (footnotes omitted), cert. denied, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); see also Greene v. Howard Univ., 134 U.S.App.D.C. 81, 412 F.2d 1128, 1135 (1969).

ding of its nature and extent. The exemption is not a personal immunity from prosecution, but is rather a recognition that the Sherman Act prohibits only those restraints which are upon trade or commerce. The occupation of one who violates the Sherman Act is irrelevent. If a group of doctors conspire to obstruct the interstate sale of health insurance their professional status would be no defense.[42] On the other hand, if a group of doctors conspire to restrain the practice of another doctor there is no Sherman Act violation because that which is restrained (i. e., the practice of a learned profession, medicine) is neither trade nor commerce.[43] With that distinction in mind, it should be clearly discernible that the impact of the Association's fee schedule in the instant case upon competition among attorneys for real estate work is not within the scope of the Sherman Act.

We do not intend to suggest that any learned profession is above the law. The "learned profession" exemption is a defense to a Sherman Act violation only where the restraint is upon the learned profession itself. That exemption is applicable only to those matters with respect to which an accord must be reached between the necessities of professional regulation and the dictates of the antitrust laws. We therefore conclude that the promulgation of a fee schedule has a sufficient part in the overall scheme devised by the State of Virginia to regulate the legal profession to claim the form of limited immunity to antitrust prosecution available under the "learned profession" exemption. Thus,

fee schedules are valid insofar as the effect is to restrain competition among attorneys.

### III. Interstate Commerce

We next turn our attention to the allegation that the fee schedule restrains those engaged in the financing and insuring of home mortgages by inflating a component part of the cost of securing housing. Since that which is allegedly restrained is not a learned profession, the "learned profession" exemption does not apply here. There is, of course, no allegation that the attorneys conspired for the express purpose of restraining the trade or commerce of those engaged in the real estate industry. However, even if the objects of conspirators were to restrain activities not protected by the Sherman Act, "they must take their victims' involvement in interstate commerce as they find them." Lehrman v. Gulf Oil Corporation, 464 F.2d 26, 36 (5 Cir. 1972). Thus, the fee schedule "may come within the purview of federal antitrust jurisdiction if the requisite effect on interstate commerce is shown." Brett v. First Federal Savings & Loan Association, 461 F.2d 1155, 1157 (5 Cir. 1972).

Under the Sherman Act it is essential that the alleged restraint of trade or commerce be shown to affect *interstate* commerce. This requirement is jurisdictional under both the Constitution [44] and the Sherman Act.[45] In examining the question of whether the Association's activities constitute a restraint of *interstate* trade for jurisdic-

42. American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943). The Court declined to resolve the question of whether the practice of medicine was a "trade" within the meaning of the Sherman Act. What the Court held was that the sale of health insurance was interstate trade and that a conspiracy among doctors to restrict it violated the Sherman Act.

43. Riggall v. Washington County Medical Soc'y, 249 F.2d 266 (8 Cir. 1957).

44. Article 1, section 8, clause 3, of the Constitution of the United States vests Congress with the power "[t]o regulate Commerce with foreign Nations, and among the several States . . . ." Pursuant to that broad grant of power Congress has enacted the Sherman Antitrust Act, 15 U.S.C. §§ 1–7.

45. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .
15 U.S.C. § 1.

**16**

tional purposes, we are guided by cases construing both the commerce clause and the Sherman Act.[46]

 It is undisputed that the activities of the Association and its members were carried on wholly within the State of Virginia. Therefore, jurisdiction will exist only if the actions complained of are shown to have a "direct and substantial" effect upon interstate commerce. Rosemound Sand & Gravel Co. v. Lambert Sand & Gravel Co., 469 F.2d 416, 418 (5 Cir. 1972); United States v. Bensinger Co., 430 F.2d 584, 588 (8 Cir. 1970). No satisfactory formula has yet been fashioned which would encompass the myriad of factors to be considered in determining whether the effect upon interstate commerce is "direct and substantial." However, since it is a mixed question of law and fact which relates to jurisdiction, we are compelled on appeal to fully examine the conclusion of the district court. In doing so we are ever mindful of the deference to be accorded the lower court's findings on questions of fact.

From the findings of fact set forth in the following passage, the district court concluded that jurisdiction did exist:

"[A] significant portion of funds furnished for the purchasing of homes in Fairfax County comes from without the State of Virginia. All or nearly all of the lenders making such loans require, as a condition of making the loan, that the title to the property involved be examined and that title insurance be furnished and paid for by the home buyer-mortgagor. This

alone warrants the conclusion that interstate commerce is sufficiently affected to sustain jurisdiction under the Sherman Act. There is also uncontradicted evidence that a large percentage of persons who live in Fairfax County work outside of Virginia and that significant amounts of loans on Fairfax County real estate are guaranteed by the United States Veterans Administration and Department of Housing and Urban Development, both headquartered in the District of Columbia. The fees charged for the title examination and insurance just mentioned are covered by the minimum fee schedule here in question." [47]

After an extensive examination of the case law and upon careful consideration of the facts enumerated above we are left with the firm conviction that the activities of the Association did not have a direct and substantial effect upon *interstate* commerce and that jurisdictional requirements are not met.

 First, the finding by the district court that many of the residents of Fairfax County, including the Goldfarbs, work outside of Virginia is totally irrelevant. The fact that a service may be utilized by one coincidentally engaged in interstate travel will not establish jurisdiction under the Sherman Act.[48] This is true even where one crosses state lines for the sole purpose of purchasing the service.[49] The interstate commerce which is allegedly affected by the fee schedule is the financing of home mortgages; the fact that the

46. In enacting the Sherman Act "Congress exercised 'all the power it possessed.'" Apex Hosiery Co. v. Leader, 310 U.S. 469, 495, 60 S.Ct. 982, 993, 84 L.Ed. 1311 (1940). Thus, in construing the jurisdictional provisions of the Act we look to the commerce clause for guidance. United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 297–298, 65 S.Ct. 661, 89 L.Ed. 951 (1945).

47. 355 F.Supp. at 494.

48. Hotel Phillips, Inc. v. Journeymen Barbers, Hairdressers, Cosmetologists & Proprietors Int'l Union of Amer., 195 F.Supp. 664 (W.D.Mo.1961).

49. The fact that some of plaintiff's patients might travel in interstate commerce does not alter the local character of plaintiff's hospital. If the converse were true, every country store that obtains its goods from or serves customers residing outside the state would be selling in interstate commerce. Uniformly, the courts have held to the contrary.
Elizabeth Hospital, Inc. v. Richardson, 269 F.2d 167, 170 (8 Cir. 1959); *accord*, Spears Free Clinic & Hospital For Poor Children v. Cleere, 197 F.2d 125 (10 Cir. 1952); Kallen v. Nexus Corp., 353 F.Supp. 33 (N.D.Ill. 1973).

mortgagor commutes across state lines to his job is of no interest to the mortgagee or to this court.

█ If jurisdiction exists in this case, it must be based upon the district court's finding that a title examination was required by out-of-state lenders and guarantors who were involved in a "significant" portion of the home purchases in Fairfax County. For that finding to be a basis for jurisdiction, it must be shown that the minimum fee arrangement with respect to real estate services had the requisite effect upon the interstate financing and insuring of home mortgages. The fact that a service is occasionally utilized to facilitate interstate activities does not subject the one providing that service to the proscriptions of the Sherman Act. United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); Evanston Cab Co. v. Chicago, 325 F.2d 907 (7 Cir. 1963). Mere involvement with some facet of interstate commerce has never been sufficient to support jurisdiction under the Sherman Act.[50] To support jurisdiction the involvement must be direct and substantial.[51]

█ In considering whether a particular activity has a direct and substantial effect upon interstate commerce the essence or nature of the activity is a factor to be considered. *See* Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341, 343 (9 Cir. 1969); Lawson v. Woodmere, Inc., 217 F.2d 148, 151 (4 Cir. 1954). Previously, the practice of law has been considered an intrastate activity. *See* Mutual Life Insurance Co. v. Liebing, 259 U.S. 209, 42 S.Ct. 467, 66 L.Ed. 900 (1922) (dictum). Some aspects of the practice of law are uniquely intrastate.[52] The act of the borrower in securing purchase-money from an out-of-state lender makes neither the selling of the house[53] nor the supplying of incidental legal services an interstate activity. "That an activity is of local character may help in a doubtful case to determine whether Congress intended to reach it." Wickard v. Filburn, 317 U.S. 111, 124, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942).

50. Neither the facts in this case nor any other authority known, supports the theory here advanced, namely, that local activities are illegal under the Sherman Act because they concern persons who have previously moved in interstate commerce or who, after receiving a local personal service, may thereafter move in interstate commerce. Hotel Phillips, Inc. v. Journeymen Barbers, Hairdressers, Cosmetologists & Proprietors Int'l Union of Amer., 195 F.Supp. 664, 669 (W.D.Mo.1961).

Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed. 2d 258 (1964), is not to the contrary, for there the plaintiff was utilizing a service in the course of his interstate travel and that service was shown to be dedicated to and an integral part of the interstate transportation of persons.

51. However, despite the increased thrust of federal commerce power as business operations become more interrelated and complex, the courts have consistently required that in order for federal antitrust jurisdiction to be sustained the effect on interstate commerce of an alleged antitrust violation in a local area must be direct and substantial, and not merely inconsequential, remote or fortuitous.

Page v. Work, 290 F.2d 323, 332 (9 Cir. 1961), cert. denied 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961).

52. We can find no logic which would support the position that the defense of a state criminal prosecution, or the trial of a divorce case would fall within the scope of interstate commerce. These activities are covered by the minimum fee schedule and the plaintiffs insist on appeal that we consider the entire fee schedule as an integral unit. We agree that the schedule is an integral unit and that real estate services are not the type of unique services whose exclusive dedication to interstate commerce requires separate consideration. *See* United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

53. *Cf.* Marston v. Ann Arbor Property Managers (Management) Ass'n, 422 F.2d 836 (6 Cir. 1970). The Sixth Circuit in *Marston* affirmed the holding by the district judge that the rental of real estate in the Ann Arbor area "is local commerce" and that the competition restrained by the alleged price fixing agreement "is local in nature." Hence the action was dismissed for failure to sufficiently plead jurisdiction essential to a Sherman Act case.

An activity which is part of a "general local service" is less likely to be subject to the Sherman Act than is an activity which constitutes an "integral part" of interstate commerce. United States v. Yellow Cab Co., 332 U.S. 218, 233, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). The evidence in the record in this case demonstrates that the members of the Association were engaged in the general practice of law and did not solicit out-of-state business. It is merely a fortuitous circumstance that the Goldfarbs, who were residents of Virginia, intended to utilize these legal services to secure a loan from a company engaged in interstate transactions. Where the impact of the disputed trade practice upon interstate commerce is "merely incidental to defendants' local activities" no jurisdiction exists under the Sherman Act. Kallen v. Nexus Corporation, 353 F. Supp. 33, 36 (N.D.Ill.1973). We are constrained to hold that the Association sought to regulate only "general local services." The fact that those services are occasionally used by persons who are simultaneously engaged in an ancillary interstate transaction to facilitate the conduct of that transaction is merely "incidental"; this does not justify federal regulation of competitive restraints upon a business which is "wholly local" in character. Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341, 343 (9 Cir. 1969).[54]

Plaintiffs have drawn our attention to numerous cases which have adopted expansive concepts of federal power and argue by analogy that the impact of the alleged restraint upon interstate commerce is no more remote here than in those cases. We have previously analyzed many of those cases in Lawson v. Woodmere, Inc., 217 F.2d 148 (4 Cir. 1954), and in Savon Gas Stations Number Six, Inc. v. Shell Oil Co., 309 F.2d 306 (4 Cir. 1962), and will not repeat what we said there. We do, however, find it persuasive that no case has been called to our attention or disclosed by our independent research where an attempt to regulate those who provide a local service which is not dedicated to interstate commerce was held subject to the Sherman Act because of the fortuitous circumstance that the consumer or recipient of that service utilized it in the course of transacting interstate business.[55] The line has been drawn far short of this.[56] We decline the invitation to announce a doctrine which

---

54. We recognize that our conclusion that no federal jurisdiction exists with respect to the Association under the Sherman Act *may* also apply to the State Bar. However, since the district court has found, upon a valid ground, that the State Bar is not liable we have chosen to affirm the decision of the court in that respect for the reasons cited by it.

55. [T]here is an obvious distinction to be drawn between a course of conduct wholly within a state and conduct which is an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states. . . . [T]his Court has on occasion determined that local conduct could be insulated from the operation of the Anti-Trust laws on the basis of the purely local aims of a combination, insofar as those aims were not motivated by the purpose of restraining commerce, and where the means used to achieve the purpose did not directly touch upon interstate commerce."

United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 297, 65 S.Ct. 661, 663, 89 L. Ed. 951 (1945).

56. We do not pretend to state precisely where that line has been drawn. Lawson v. Woodmere, Inc., 217 F.2d 148 (4 Cir. 1954), is the leading case in this Circuit as to what constitutes a direct and substantial burden on interstate commerce. Although analogies in such matters are seldom helpful we find the remoteness in the instant case far greater than that in *Lawson* where this court found that no jurisdiction existed.

With respect to the remoteness issue, this case can be compared to Gordon v. Illinois Bell Telephone Co., 330 F.2d 103 (7 Cir. 1964). There the plaintiff was engaged in the business of providing a telephone answering service for businesses, many of which were engaged in interstate commerce. The defendant, a local telephone company, allegedly discontinued a particular switchboard operation to drive the plaintiff out of business. Plaintiff brought an action for treble damages under the Sherman Act. In

would sweep away the concept of remoteness, a concept which has historically limited federal power over commerce.

## IV. Judicial Legislation

In recent times an unusually large number of noteworthy articles have appeared in legal periodicals discussing the merits and demerits of minimum fee schedules.[57] Those articles undertake to demonstrate that better methods are available to secure the objectives sought by minimum fee schedules; indeed, they have served to call to our attention logical and persuasive reasons for abandoning fee schedules. We do not doubt that they present cogent arguments for consideration by a legislature or bar association. However, we do not find such considerations controlling in a judicial setting. "These, plainly, are questions as to the policy of legislation which belong to another department, and this court has no function to supervise such legislation from the standpoint of wisdom or policy." Northern Securities Co. v. United States, 193 U.S. 197, 352, 24 S.Ct. 436, 463, 48 L.Ed. 670 (1904); quoted with approval in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533 at 562, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944).

We sit as a court of law. The question before us is whether the defendants' fee schedule system restrains trade or commerce in violation of the Sherman Act. While some of the cases cited and discussed herein demonstrate that traditionally the Sherman Act was not believed to cover the activities involved here, the Goldfarbs urge us to depart from that line of cases. They insist that we look to economic realities

and adapt the broad language of the Sherman Act to the evolution of modern commercial practice. The answer to that is "it is not for the courts to indulge in the business of policy-making in the field of antitrust legislation." United States v. Cooper Corporation, 312 U.S. 600, 606, 61 S.Ct. 742, 744, 85 L.Ed. 1071 (1941). The Goldfarbs also ignore the restrictions of the commerce clause which are not to be disregarded by this court.

In effect, what the Goldfarbs urge upon us is judicial legislation. This is an area in which such legislation would be most inappropriate. To hold that the practice of law is subject to the Sherman Act would cast doubt upon the validity of bar admission standards, prohibitions upon advertising, and a multitude of other restrictions upon the practice of law. In our governmental system a legislative body is better equipped to accommodate these restrictions imposed upon the practice of a profession to the overall design and purpose of the antitrust laws.

Furthermore, antitrust laws are *punitive* as well as remedial. Any action on this subject matter by a legislative body will clearly be prospective. The ramifications of a judicially initiated extension of the coverage of the Sherman Act is less certain. The potential of the retroactive application of such a judicial extension coupled with the doubt it would cast upon the continuing viability of other ethical restrictions would create confusion in a profession where order is essential.

Our concern over retroactive application of this punitive statute does not end there. Even the most astute lawyer who

affirming dismissal of the action on appeal the court said the fact that "a few of plaintiffs' customers are engaged in interstate commerce is too unrelated a factor to impress plaintiffs' operation with an interstate character within the meaning and ambit of the Sherman Act." *Id.* at 106.

57. *E. g.*, Arnould & Corley, Fee Schedules Should be Abolished, 57 A.B.A.J. 655 (1971); Morgan, Where Do We Go from

Here with Fee Schedules, 59 A.B.A.J. 1403 (1973); Minimum Fee Schedules as Price Fixing: A Per Se Violation of The Sherman Act, 22 Am.Univ.L.Rev. 439 (1973); The Antitrust Division v. The Professions—"No Bidding" Clauses And Fee Schedules, 48 Notre Dame Lawyer 966 (1973); The Wisconsin Minimum Fee Schedule: A Problem of Antitrust, 1968 Wisc.L.Rev. 1237 (1968); *see also* The Learned Professions, 33 A.B.A. Antitrust L.J. 48.

could foresee judicial legislation extending the coverage of the Sherman Act to his profession would have been on the horns of a dilemma: if he followed the minimum fee schedule he *could* be violating the Sherman Act; if he did not follow it he *would* be in violation of the Virginia Code of Professional Responsibility. It would be an illusory choice since either action might result in punishment. The law does not compel this harsh result.

For the reasons stated we conclude that neither the Virginia State Bar nor the Fairfax County Bar Association has violated the Sherman Antitrust Act. The judgment of the district court is affirmed with respect to the Virginia State Bar and is reversed and vacated with respect to the Fairfax County Bar Association.

Affirmed as to No. 73–1247; reversed as to No. 73–1248.

CRAVEN, Circuit Judge (concurring and dissenting):

I would affirm the judgment of the district court both in holding the Fairfax County Bar Association liable for violating section 1 of the Sherman Act, 15 U.S.C. § 1, and in exonerating the Virginia State Bar. Thus I concur in the result the majority reaches as to the State Bar, and dissent as to Fairfax County Bar Association.

I take it, as I read the majority opinion, that we all agree that Judge Bryan correctly stated the rule of the Sherman Act, were it to govern this case.

Minimum fee schedules are a form of price fixing and therefore incon-

sistent with antitrust statutes prohibiting anti-competitive activities.

"Price fixing is per se an unreasonable restraint of trade. It is not for the courts to determine whether in particular settings price-fixing serves an honorable or worthy end. An agreement, shown either by adherence to a price schedule or by proof of consensual action fixing the uniform or minimum price, is itself illegal under the Sherman Act, no matter what end it was designed to serve." United States v. Real Estate Boards, 339 U.S. 485, 489, 70 S.Ct. 711, 714, 94 L.Ed. 1007 (1950).

355 F.Supp. at 493. The majority has concluded, however, that the Sherman Act applies to neither the State Bar nor Fairfax.

They say that the Virginia State Bar may lawfully fix prices for legal services —not because it is a sufficiently independent regulatory agency to come within the *Parker* exemption [1]—but because it is "actively supervised" by the Supreme Court of Virginia. Majority opinion at 11. In so holding, the majority relies upon a stipulation that was not adopted by the district judge:

> 16. The Virginia Statutes have given the Supreme Court of Virginia authority to make questions involving suggested fee schedules and economic reports of the State Bar and of Local Bar Associations questions of ethics under the laws of Virginia.

In refusing the stipulation, the district court expressly noted that it was a conclusion of law rather than a fact. 355 F.Supp. at 492 n. 2.[2] He also intimated

1. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

2. The statute that is claimed to give the Supreme Court authority to prescribe fee schedules does not mention fees at all.

> The Supreme Court may, from time to time, prescribe, adopt, promulgate and amend rules and regulations:
>
> (a) Defining the practice of law.
>
> (b) Prescribing a code of ethics governing the professional conduct of attorneys-

at-law including the practice of law or patent law through professional law corporations, professional associations and partnerships, and a code of judicial ethics.

> (c) Prescribing procedure for disciplining, suspending, and disbarring attorneys-at-law.

Va.Code § 54–48 (as amended 1973).

The court's authority is further circumscribed by § 54–51:

> Notwithstanding the foregoing provisions of this article, the Supreme Court of Ap-

that he had some difficulty seeing what, if anything, a minimum fee schedule has to do with ethics. *Id.* at 496 n. 4. These questions and others like them can best be left to the Supreme Court of Virginia. Whatever that court may think of the power claimed for it to equate price fixing with legal ethics, I think it will be surprised to learn that it is engaged in *active* supervision of the State Bar's implementation of *minimum* fee schedules in Virginia. I find nothing in the record to suggest that the Virginia court even knew that Fairfax County Bar Association had a minimum fee schedule, or that it approved it either directly or indirectly through the State Bar.

I would exonerate the State Bar not because it falls within the *Parker* exemption but for the second reason advanced by the district judge: the exceedingly "minor role" of the State Bar in this matter. He found that the State Bar did not promulgate the minimum fee schedule, did not endorse or approve it, never undertook to discipline any attorney for violating it, and never contemplated any such action. All the State Bar ever did, apparently, was to suggest that local associations might wish to adopt a minimum fee schedule and to circulate reports on the schedules that local bar associations had adopted. Such minimal participation seems to me insufficient to impose Sherman Act liability upon the State Bar. *See* United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 494–496, 70 S.Ct. 711, 94 L.Ed. 1007 (1950).

As to Fairfax County Bar Association, I am in complete agreement with the majority that the local association cannot and does not qualify for the *Parker* exemption. Nevertheless they exonerate Fairfax on two grounds: (1) that the practice of law is a learned profession rather than a trade ᴏʳ business, and that lawyers are thus exempt from the

Sherman Act's prohibition of price fixing; and (2) that the practice of law in Fairfax County, and more especially the investigation and certification of land titles in that county, do not sufficiently affect interstate commerce to invoke the Sherman Act.

If the majority is correct that interstate commerce is not sufficiently affected, that is the end of the matter and there is no occasion or necessity to apply the *Parker* exemption to exonerate the State Bar and the so-called learned profession exemption to exonerate Fairfax. I believe, however, that Fairfax County minimum fees have a sufficient impact on interstate commerce. The applicable standard was stated succinctly in Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967):

> [I]t is well established that an activity which does not itself occur *in* interstate commerce comes within the scope of the Sherman Act if it substantially *affects* interstate commerce.

*Id.* at 321 (emphasis in original).

The district court found as a fact that a significant portion of funds furnished for the purchasing of homes in Fairfax County comes from outside the State of Virginia. His finding is supported by substantial evidence. One sample taken from the Office of Recorder of Deeds of Fairfax County indicated that $75,000,000 out of $136,000,000 loaned for mortgages was loaned by persons or corporations residing outside or incorporated outside of Virginia. During 1968–72 more than $570,000,000 of loans was either guaranteed by the United States Veterans Administration or insured by the United States Department of Housing and Urban Development, both of which are headquartered in the District of Columbia. In addition to the interstate commerce in loans, there was evidence tending to show substantial interstate movement and travel of persons into northern Virginia. Indeed, the evi-

peals shall not adopt or promulgate rules or regulations prescribing a code of ethics governing the professional conduct of at-

torneys at law, which shall be inconsistent with any statute . . . . .
Va.Code § 54–51.

dence tended to show that more than 30 percent of the population of Arlington County, Fairfax County, and the city of Alexandria in 1970 had come from areas outside Virginia since the year 1965. The district judge accepted "uncontradicted evidence" that a large percentage of persons who live in Fairfax County work outside of Virginia. We may judicially notice, I think, that Fairfax County is one of Washington's bedrooms. The cumulation of these facts persuades me that housing in Fairfax County is a commodity offered for sale in interstate commerce. It cannot realistically be considered a purely local market.

The evidence also demonstrates that the minimum fee schedules affect the cost of housing in Fairfax County. The district court found that all or nearly all money lenders require title examination and title insurance. Title search fees thus become a part of the cost of housing. The price that thousands of employees in the District of Columbia have to pay for housing in Fairfax County, Virginia, has, it seems to me, a direct, immediate, and substantial effect on interstate commerce. It is irrelevant that the restraint occurs only in Fairfax County. I would have thought it beyond question that the Sherman Act encompasses local restraints that directly affect the cost of a commodity offered for sale in interstate commerce. This was the thrust of the holding in Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948), where the Court said:

> [T]he inquiry whether the restraint occurs in one phase or other, interstate or intrastate, of the total economic process is now merely a preliminary step, except for those situations

in which no aspect of or substantial effect upon interstate commerce can be found in the sum of the facts presented.

*Id.* at 234. In United States v. Women's Sportswear Manufacturers Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 1005, 93 L. Ed. 805 (1949), Mr. Justice Jackson, writing for the Court, stated:

> The source of the restraint may be intrastate, as the making of a contract or combination usually is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.

I believe the district court's findings of fact are not clearly erroneous and compel the conclusion that an agreement to fix fees that infect the cost of housing in Fairfax County has a sufficient impact on interstate commerce to come within the Sherman Act. The Supreme Court has said that "Congress, in passing the Sherman Act, left no area of its constitutional power unoccupied; it 'exercised all the power it possessed.'" United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 298, 65 S.Ct. 661, 664, 89 L.Ed. 951 (1945). I believe it is much too late to dismiss as "expansive concepts of federal power" an interpretation of the commerce clause that would embrace the fee schedules involved here. Since the modern era of the commerce clause began in 1937 with NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed.2d 893 (1937),[3] the Supreme Court has consistently approved congressional regulation of local activities that have a potential for affecting interstate commerce.[4] Our

---

3. The 1937 change of direction was so significant that casebooks now divide study of the commerce power into two parts: before and after 1937. *See, e. g.,* G. Gunther & N. Dowling, Constitutional Law § 5: "The Commerce Power Since 1937—Constitutional Revolution or Continuity?" (8th ed. 1970); W. Lockhart, Y. Kamisar & J. Choper, Constitutional Law § 3: "Evolution of

National Power Over National Economic Problems: I. Limitations on Federal Power Through 1936; II. Expansion of Federal Power After 1936" (3d ed. 1970).

4. The recent history of the commerce clause is surveyed in Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).

interpretation of the Sherman Act should keep pace with these decisions. *See* United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 557, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944).

Nor can I accede to the view that the legal profession is exempt from the Sherman Act. The majority states that two cases decided by the United States Supreme Court hold "that one engaged in the practice of a profession 'follow[s] a profession and not a trade.'" Majority opinion at 13. They are mistaken. The Supreme Court has never so held and indeed has refused to "intimate an opinion on the correctness of the application of the term [trade] to the professions." United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 491–492, 70 S.Ct. 711, 715, 94 L.Ed. 1007 (1950); American Medical Ass'n v. United States, 317 U.S. 519, 528, 63 S.Ct. 326, 87 L.Ed. 434 (1943). Nor has any inferior federal court ever so held.[5] Nothing supports the so-called "learned profession" exemption except dicta from cases decided in an era of judicial antagonism to governmental regulation of business and commerce. FTC v. Raladam Co., 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324 (1931), involved the Federal Trade Commission's efforts to regulate the manufacturer and seller of an obesity cure. It had nothing to do with any learned profession, but Mr. Justice Sutherland included in his opinion the dictum that medical practitioners "follow a profession and not a trade . . . ." *Id.* at 653.

The other case said to be the source of the "learned profession" exemption is Federal Baseball Club v. National League of Professional Baseball Clubs, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922). In the course of deciding that the Sherman Act did not apply to organized baseball, Mr. Justice Holmes found occasion to state that not only is baseball not "trade or commerce in the commonly accepted use of those words," but that any "personal effort, not related to production, is not a subject of commerce."[6] He then repeated illustrations given by the court below:

[A] firm of lawyers sending out a member to argue a case, or the Chautauqua lecture bureau sending out lecturers, does not engage in such commerce because the lawyer or lecturer goes to another State.

*Id.* at 209.

The last and final support for the so-called "learned profession" exemption is found in a 1932 opinion by Mr. Justice Sutherland who quotes with approval from an opinion by Mr. Justice Story, as set out in the majority opinion at footnote 35. Not only was the reference to learned professions irrelevant to the decision in the case, but it is clear from the context that Justice Story's language was used to broaden rather than constrict the definition of the word "trade."

5. The opinion that medicine was not a trade was the basis for the district court decision in the AMA case, but the court of appeals reversed on the issue, and the Supreme Court avoided it on the second appeal of the case. United States v. American Medical Ass'n, 28 F.Supp. 752 (D.D.C.1939), rev'd, 72 App.D.C. 12, 110 F.2d 703, cert. denied 310 U.S. 644, 60 S.Ct. 1096, 84 L.Ed. 1411 (1940); United States v. American Medical Ass'n, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943). The only other holding that even remotely resembles a "learned profession" exemption is Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges & Secondary Schools, Inc., 139 U.S. App.D.C. 217, 432 F.2d 650, cert. denied, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970), and the court there was careful to note that it was not creating a wide-ranging exemption for college accreditation associations. Riggall v. Washington County Medical Society, 249 F.2d 266 (8th Cir. 1957), included a statement that the practice of medicine is neither trade nor commerce, but the decision of the court rested on several other grounds, including the absence of any connection with interstate commerce and the failure to allege monopolization or injury to the public.

6. 259 U.S. at 209. This broad declaration has been rejected by subsequent cases that have applied the Sherman Act to personal services. *See* United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 489–492, 70 S.Ct. 711, 94 L.Ed. 1007 (1950).

**24**

Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 52 S.Ct. 607, 76 L.Ed. 1204 (1932).

Upon these three dicta the majority erect the "learned profession" exemption from the Sherman Act. I am respectfully of the opinion that there is no such exemption and that none was ever intended by the Congress. One of the slender, supports upon which the doctrine is said to rest has itself been destroyed by the Supreme Court. In Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), the Supreme Court had occasion to reexamine Mr. Justice Holmes' opinion in *Federal Baseball*. In refusing to extend the baseball umbrella to cover football, Mr. Justice Clark explained that the Court had adhered to the baseball exemption from the Sherman Act "because it . . . concluded that more harm would be done in overruling *Federal Baseball* than in upholding a ruling which at best was of dubious validity." *Id.* at 450. In virtually conceding that it is nonsense to have baseball outside the Sherman Act and football within it, Mr. Justice Clark noted, "were we considering the question of baseball for the first time upon a clean slate we would have no doubts." *Id.* at 452.[7]

The Court's repudiation of the rationale for *Federal Baseball* and its twice-repeated refusal to express any opinion on the learned professions leave the claimed exemption without any affirmative support in Supreme Court cases. I do not find the dicta from another era persuasive, much less compelling, and I am unable to perceive any reason why lawyers should be free to fix prices when carpenters cannot. In the opinion below, Judge Bryan said:

> The scope of the statutory language in the Sherman Act is so expansive that courts have been reluctant to find

exceptions. The language explicitly states that "*every* contract, combination or conspiracy which restrains commerce among several states is unlawful." (Emphasis supplied.) Illustrative of this reluctance is the refusal to extend baseball's exempt status to other professional sports . . . . The fact that specific exemptions are clearly delineated suggests that ambiguities should be resolved in favor of inclusion. This is especially true where price-fixing is involved since it has been declared both pernicious and lacking in any redeeming social value.

355 F.Supp. at 493 [citations omitted]. I agree with his analysis. I do not think this court should create another exemption that will almost certainly lead to the same problems that *Federal Baseball* has given the Supreme Court. Members of other "learned professions" will no doubt seek the same exemption, and the label will be of little help in deciding whether to sanction price fixing by architects, marriage counselors, dentists, and other groups that operate under ethical standards.

> [A]rticulating the reasons lawyers need a fee schedule, as distinguished from other groups which perform public services, might present some embarrassing difficulties and lead the courts into a quagmire in determining the relative societal importance of all groups seeking exemption.

Note, The Wisconsin Minimum Fee Schedule: A Problem of Antitrust, 1968 Wisconsin L.Rev. 1237, 1257 (footnotes omitted).

Although the practice of law is a learned profession, it is pursued for the purpose (among others) of earning a living. To that extent I think it falls within the strictures of the Sherman Act, and I would affirm the decision below.

7. Organized football was not the first enterprise to seek an antitrust exemption under *Federal Baseball*. The Supreme Court had earlier rejected the pleas of organized boxing and the theater. United States v. International Boxing Club, Inc., 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955); United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955).